UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                          :

DENNIS P. MAHER and THE MARY E. MAHER      :
RESIDUARY TRUST,                       :

                          :

           Plaintiffs,           :        22-cv-6506 (LJL)

                          :

          -v-                :        OPINION AND ORDER

                          :

GLOBAL FACTORS LLC and RALPH C. JOHNSON,  :

                          :

          Defendants.        :

                          :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/08/2024

LEWIS J. LIMAN, United States District Judge:

      Plaintiffs Dennis P. Maher ("Maher") and the Mary E. Maher Residuary Trust (the "Trust" and together with Maher, the "Plaintiffs") bring this action against defendants Global Factors LLC ("Global Factors" or the "Company") and Ralph C. Johnson ("Johnson" and together with Global Factors, the "Defendants") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, negligent misrepresentation, and common law fraud.  Dkt. No. 7.  Plaintiffs allege that Johnson, as Chairman of Global Factors, made materially false and misleading statements and omitted material information about himself and Global Factors, with the intent and effect of enticing Plaintiffs to invest in Global Factors.  *Id.* at 14–18.

      The Court conducted a bench trial in this action from February 5, 2024 to February 7, 2024.  The Court received direct testimony from Maher, Johnson, Christopher J. Rossi, and Randy Langhamer.  Each witness provided live testimony in response to direct examination, cross-examination, re-direct examination, and re-cross examination.  The parties also submitted a joint Statement of Stipulated Facts.  *See* Dkt. No. 39 at 15–17 (the "Stipulated Facts").  The

Court heard closing statements at the conclusion of the trial.  It also conducted oral argument on the issues of loss causation and damages on July 1, 2024.  Following oral argument, each party submitted supplemental briefing regarding those issues.  *See* Dkt. Nos. 54, 55.

This Opinion and Order constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a)(1).  To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

For the reasons that follow, the Court concludes that Defendants are jointly and severally liable to Plaintiffs for violations of the Securities Exchange Act and common law fraud.

## FINDINGS OF FACT

Dennis P. Maher is an individual who resides in Snohomish County, Washington and is the owner of the Dennis P. Maher Individual Retirement Account (the "Maher IRA").  Stipulated Facts ¶ 1.  The Mary E. Maher Residuary Trust is a testamentary trust that was established upon the death of Mary E. Maher on July 29, 2015.  *Id.* ¶ 2.  Maher is the trustee of the Trust and makes the investment decisions for the Trust.  *Id.*  At the time of the events at issue in this case, Maher had experience investing in private placements, including several in real estate.  Trial Transcript ("Trial Tr.") at 145:9–15.

Johnson is an individual who resides in the State of New Jersey and maintains a principal place of business in New York County, New York, and was the Chairman of Global Factors, Stipulated Facts ¶ 3, a company formed to provide financing to small business owners through the purchase of accounts receivable, Trial Tr. at 188:19.

## I.     The Events Leading to Maher's Investments in Global Factors

In or about early 2018, Maher was informed of Global Factors by a friend from college, Darren Laybourn, who had previously purchased interests in Global Factors.  Trial Tr. at 7:1–15.  Laybourn introduced Maher to Howard Allen, a broker for Global Factors who, in turn,

introduced Maher to Johnson.  Trial Tr. at 124:7–125:13.

Johnson first contacted Maher by email on August 6, 2018.  Plaintiff's Exhibit ("PX") 7.  Johnson introduced himself as the Chief Executive Officer and founder of Global Factors and described Global Factors as "a leading provider of cash flow solutions to merchants all across the country."  *Id.*  Johnson stated that he had been given Maher's name by Howard Allen, who described Maher to Johnson as a potential investor referred by Laybourn.  *Id.*  Johnson attached the Company's Confidential Private Placement Memorandum dated May 16, 2016 (the "PPM"), shared a link to the company's website video, and offered to make himself available to answer any questions.  *Id.*

The PPM described an offering of preferred units by Global Factors.  *Id.* at MAHER 000398.  The offering consisted of Class A Units, Class B Units, and Class C Units.  *Id.* at MAHER 000399.  All of the Units, regardless of which Class the investor purchased, would give the investor the right to a base distribution payment equal to one percent of the investor's unreturned capital contribution per month.  *Id.*  Class B Unit holders, defined as investors that purchase at least 10,000 units for a purchase price of $1,000,000, would receive an additional cash distribution on the anniversary date of the issuance of such units equal to 1.5 times the holder's original capital contribution, while Class C Unit holders, defined as investors that purchase at least 30,000 units for a purchase price of $3,000,000, would receive an additional cash distribution on the anniversary date of the issuance of such units equal to 3.5% of the holder's original capital contribution.  *Id.*  It described Global Factors as having been "formed to offer small businesses a variety of financing alternatives including payroll advances directly and through third-party professional employer organizations, accounts receivable factoring, short-term line of credit loans, and other types of loans products and cash flow financing in the

discretion of the Manager." *Id.* at MAHER 000399–400, 406.  The PPM contained a disclaimer regarding the forward-looking statements contained therein, which included a list of factors and risks that it warned could cause Global Factors's actual results to differ from the results anticipated by any forward-looking statements.  *Id.* at MAHER 000405.  Later, it contained a disclosure regarding "Litigation and Legal Matters," which stated that "Ralph Johnson, PAA, and certain of its principals, and an affiliate of the Company" had been charged in a civil complaint filed by the United States Securities and Exchange Commission ("SEC") with "making a number of claims regarding the Affiliate's disclosures to its investors during 2011 through 2013."  *Id.* at MAHER 000435.  The disclosure also contained a link to the SEC complaint.  *Id.*  The disclosure added: "The Affiliate and Mr. Johnson believe the allegations in the complaint are without factual merit and plan to vigorously defend themselves against the allegations.  There can be no assurance that they will prevail."  *Id.*[1]  Maher skimmed through the PPM when he received it but did not read through all of it entirely.  Trial Tr. at 126:9–10.

The initial email containing the PPM sparked a lengthy correspondence between Maher and Johnson regarding Global Factors, and Maher's potential purchase of preferred units in the Company.  Maher responded to Johnson's August 6, 2018 email the following morning with a request to Johnson and Allen for copies of the Company's last two annual independent auditor reports.  PX 8.  Johnson responded the same day with a copy of the Company's 2016 independent auditors' report, which spanned from the Company's inception on April 26, 2016 through December 31, 2016, but stated that the annual report for the 2017 fiscal year was still

---

[1] The PPM also states with respect to Allen: "In 2013, Mr. Allen was the subject of a disciplinary proceeding by FINRA for alleged violations of NASD Conduct Rules 3040 and 2010 and FINRA Rule 2010.  Without admitting or denying the allegations, Mr. Allen was fined $10,000 and suspended from association with any FINRA member for the eight-month period from January 6, 2014 to September 5, 2014."  PX 7 at MAHER 000411.

being prepared. *Id.* Instead, he offered to send Maher the internal management balance sheet, which had not been audited, for 2017. *Id.* The 2016 independent auditors' report reflected assets of $2,403,607, total liabilities of only $3,750, and total members' equity of $2,399,857. *Id.* at MAHER 000498. The 2016 audited balance sheet was modestly comforting to Maher because, although it contained figures for only the first roughly eight months of the fund, it showed that Global Factors had sufficient assets to cover its liabilities. Trial Tr. at 14:3–12.

The following morning, August 8, 2018, Maher responded with a request to see Global Factors's 2017 income statement and year-end balance sheet, PX 9, because the figures from the end of 2017 would be more meaningful than those from the end of 2016, Trial Tr. at 15:8–10. The same day, Johnson responded that he would have his office provide the financial statements. PX 9. On Friday August 10, 2018, Johnson emailed Maher and Allen: "I will have the office send over the 2017 numbers as well as the mid-year report for 2018, as it has been another good six months for us. Our growth rate is triple digit year over year for the last 2016-2017, and we are on pace for the same this year." PX 10. Johnson added:

> Food for thought: We purchase receivables anywhere between 67 and 72% of face value on average per year and collect on most contracts on a daily basis (35% of higher gross IRR). A small percentage are collected weekly and one or two are collected monthly. On the other hand, our investors collect 12% paid monthly at the highest frequency, and most reinvest. Good for both of us. They compound 12 times per year, we compound more than that. Powerful numbers.

*Id.*

In the days after Johnson sent Maher the PPM, Maher and Johnson discussed a number of Maher's initial questions about the Company over the phone. Trial Tr. at 19:11–15, 38:12–15, 135:12–13, 220:8–9. The exact date of the conversation, how the conversation came about, and the precise contents of the telephone conversation are either unknown or disputed. During the call, Maher and Johnson discussed the Company generally and certain accounting questions

specifically, as well as the SEC complaint disclosed in the PPM, notwithstanding that Maher's initial reaction was that the disclosure was the "typical kind of CYA language for a private placement." Trial Tr. at 10:21–22. In that conversation, and during phone calls that followed, Johnson described the business of Global Factors and the security it received for the assets it acquired. Trial Tr. at 38:16–43:13. Johnson stated that Global Factors was in the business of buying receivables from companies that were navigating a period of growth, needed cash in order to operate, and were willing to pay a premium in order to receive immediate cash. Trial Tr. at 38:24–39:6. In response to Maher's questions regarding the security Global Factors received for the cash it was extending, Johnson said that the loans were "very secure" and that "every loan was fully collateralized," that Global Factors made Uniform Commercial Code ("UCC") filings to ensure that the collateral it received was unencumbered, that it received personal guarantees from the principals or owners of the companies, that it "vigorously enforced" its rights to collateral and the guarantees, and that Global Factors received personal financial statements from the guarantors of the loans it was making.[2] Trial Tr. at 42:18–43:8; *see also* Trial Tr. at 129:8–24. Maher asked Johnson about the size of the companies that Global Factors purchased receivables from and was told that Global Factors's portfolio was well diversified in terms of both company size and geography. Trial Tr. 132:17–19. With respect to the discussion of the SEC complaint, Maher testified that Johnson stated to him that the

---

[2] It was a standard part of Global Factors's pitch for investors that the firm would emphasize the security of its underlying contracts with customers. Trial Tr. at 355:12–20. As a general matter, Johnson would describe the underlying contracts as triple secured and collateralized. *Id.* First, the customer financing was full recourse—meaning that if a customer defaulted, Global Factors could reach customer assets beyond the secured collateral specified in the contract in order to recover the full amount of the financing provided. *Id.* Second, Global Factors's contracts were collateralized by hard assets. *Id.* Third, Global Factors would have a personal guarantee from the owner or Chief Executive Office of the customer. *Id.*

complaint was "nothing to worry about" and the "typical disgruntled investor."  Trial Tr. at 11:8–9.  Johnson testified that Maher asked about the complaint and that he told Maher that the complaint grew out of a broker-dealer investigation, Trial Tr. at 198:1–4, 372:14–17, and that he told Maher to review the complaint for himself, Trial Tr. at 198:5–7.  It is not disputed that Maher did not read the SEC complaint at that time.  Trial Tr. at 138:21–139:9.

On Monday, August 13, 2018, Maher wrote to ask for a list of member account activity for July 2018.  PX 11.  On August 14, 2018, in response to Maher's request for Global Factors's audited financial statements, a representative of Global Factors provided Maher with a copy of Global Factors's unaudited year-end 2017 Balance Sheet and a June snapshot of beginning balances for each investor account.  PX 12.  Johnson informed Maher that Global Factors's audited financial statements had not yet been prepared.  PX 13.  The unaudited Balance Sheet as of December 31, 2017 reflected Total Assets of $9,810,445.47, Total Long Term Liabilities of $8,986,700.95, and Total Equity of $823,744.52, but a negative value for Members Equity of $346,890.33.  PX 12 at MAHER 000550.  The "snapshot" showed the beginning balances that investors had with Global Factors as of May 31, 2018, and the closing balances that investors had with Global Factors as of June 30, 2018, with the difference reflecting new deposits, withdrawals, and income earned over the period.  *Id.* at MAHER 000552.  It reflected that Global Factors had $12,596,512.40 in investor balances at the beginning of the period and $13,757,967.13 at the end of the period.  *Id.*  Maher spoke with Johnson about the negative Members Equity entry on the December 31, 2017 balance sheet.  Johnson responded that the balance sheet contained a figure for "Receivables Premium" of $1,633,121.61 on the Asset side of the balance sheet, which was balanced by a figure in the same amount for "Deferred Rec[eivables] Premium Income" on the liabilities side of the balance sheet; Johnson noted that

the figure reflected the value of the receivables that Global Factors had purchased in excess of the amount that it had spent to purchase them, and that, when the Asset and corresponding Liability were both excluded, Global Factors had members equity of roughly $1,200,000.  Trial Tr at 19:23–20:14.

Later on August 14, 2018, Maher also requested any available financial statements that were current as of June 30, 2018.  PX 13.  The following day, Global Factors sent Maher the Company's second quarter balance sheet and profit and loss statement.  PX 14.  The statements showed that, as of June 30, 2018, Global Factors had Total Assets of $12,650,305.92, Total Liabilities of $11,997,232.95, Members Equity of negative $831,359.09, and Total Equity of $653,072.97.  Several days later, on August 20, 2018, Johnson sent Maher a revised balance sheet as of June 30, 2018, which contained minimal changes to the Company's Total Liabilities, but which contained a higher figure—$4,424,581.03 on the revised balance sheet compared to $2,684,582.61 on the prior balance sheet—for the "Receivables Premium" Asset Entry and the corresponding "Deferred Rec[eivables] Premium Income" Equity Entry.  PX 15

Maher responded the following morning with several questions regarding the financial information that Johnson had provided over the preceding days.  PX 16.  Maher sought to calculate a simple and rough estimate of how the Company's assets compared to the Company's member accounts, a concept which Maher referred to in the email as the "cushion."  *Id.*  Maher expressed some surprise and concern that the "cushion" was virtually nonexistent when he subtracted from the Company's total loans to customers of $14.4 million the Company's member accounts of $13.8 million, along with the deferred commission expense of $244 thousand, and the allowance for bad accounts of roughly $360 thousand.  *Id.*  Maher had expected that the loans made by the Company would exceed member accounts by at least ten percent.  *Id.*  Johnson

8

responded to Maher's email with an explanation of the deferred commission expense, and he

suggested that the deferred commission expense artificially deflated the "cushion" in the near-

term such that Maher's "cushion" concept did not accurately reflect the solvency of the

Company.  PX 17.

The same day, Maher responded with a self-prepared spreadsheet purporting to calculate

the "cushion" of assets in excess of member accounts; Maher requested feedback on the

calculation and suggested that Johnson update the spreadsheet monthly.  *Id.*  Maher followed up

the following morning, on August 22, 2018, with a specific question regarding an accounting

entry and an updated spreadsheet calculating the "cushion."  PX 18.  Johnson did not respond to

Maher's questions regarding the spreadsheet, but he did provide further explanation of an

accounting concept that Maher had inquired about.  *Id.*  Maher revised his spreadsheet

accordingly and shared the updated version with Johnson.  PX 19.

Johnson and Maher then spoke on the phone.  PX 20.  After the call, in the afternoon of

August 22, 2018, Johnson followed up with Maher by email.  *Id.*  In that email, Johnson

emphasized that "there is just no way to provide the comparison you're looking for," but

suggested that he could provide "a monthly example of assets vs. liabilities over the course of a

typical month . . . ."  *Id.*  Johnson also stated that he "had the numbers updated to reflect both

cash and book entry activity through June 30, 2018" for Maher, and he attached the further

revised version of the Company's balance sheet as of June 30, 2018.  *Id.*  In the revised balance

sheet, the Total Assets were $15,545,985.51, the Total Liabilities were $13,757,967.17, and the

Total Equity was $1,788,018.34, including a figure for Members Equity of negative

$1,707,510.38.  *Id.*  Over the remainder of the afternoon, and into the following morning, Maher

and Johnson exchanged emails about updating Maher's self-made "cushion" spreadsheet to

reflect the figures as of July 31, 2018.  PX 22.  After a few exchanges, Johnson edited Maher's spreadsheet to reflect the figures as of July 31, but emphasized that "[o]ther necessary minor adjustments to deferred commission etc, haven't been made."  *Id.*

In the weeks that followed, Maher and Johnson continued to exchange versions of the spreadsheet each month with updated figures as they became available.  *See*, *e.g.*, PX 24; PX 25.

## II.   Maher's Investments in Global Factors

On or around October 10, 2018, Maher made his first investment in Global Factors.  He purchased, through the Dennis P. Maher Individual Retirement Account ("IRA"), 5,230 Class A preferred units of Global Factors for a total of $523,000.  PX 1.  In the subscription agreement, Maher acknowledged having received and reviewed the Private Placement Memorandum, the Operating Agreement, and the Subscription Agreement for Global Factors.  *Id.*  Maher also signed an investor suitability questionnaire (on behalf of the IRA), certifying that he was an accredited investor, that his net worth was in excess of $5,000,000, that his annual income was in excess of $100,000, and that he had over thirty years of investment experience, and that he was making the investment for purposes of capital appreciation and speculation.  *Id.*

Even after he made his first investment, Maher continued to maintain the "cushion" spreadsheet, reflecting the assets of Global Factors, the member account balances, the allowance for bad accounts, and what Maher calculated as the cushion for his investment—the assets as reduced by member account balances and an allowance for bad accounts.  Trial Tr. at 43:22– 44:2.  Global Factors and Johnson continued to send Maher monthly reports as requested.  Trial Tr. at 44:3–5, 224:3–8; PX 25; PX 26; PX 27.  As of the end of October 2018, the spreadsheet showed a "cushion" of approximately $2.1 million.  Trial Tr. at 45:9–15; PX 27.

On or around November 13, 2018, Maher made his second investment in Global Factors by purchasing 4,300 Class B Preferred shares of Global Favors for a total of $430,000 on behalf

of the Trust.  PX 2.  He once against acknowledged receipt and review of the Private Placement

Memorandum, the Operating Agreement, and the Subscription Agreement for Global Factors.

*Id.*  His questionnaire signed on the same date reflects that he was making the investment for

purposes of capital appreciation and speculation, and that the Trust had a net worth in excess of

$3,000,000, annual income in excess of $200,000, and fifteen years of investment experience.

*Id.*

Finally, on or around December 5, 2018, Maher made his third investment in Global

Factors, on behalf of the Maher IRA, for 490 Class B preferred units for a total of $49,000.

PX 3.  He acknowledged receiving and reading the Private Placement Memorandum, the

Operating Agreement, and the Subscription Agreement, and stated that the investment was for

purposes of capital appreciation and speculation.  *Id.*  The $49,000 investment resulted in Maher

having invested over one million dollars in Global Factors and, as a result of Maher's prior

agreement with Johnson, the 5,230 Class A preferred units of Global Factors purchased by the

Maher IRA were converted to 5,230 Class B units of Global Factors, valued at a purchase price

of $523,000.  Stipulated Facts ¶ 9.

## III.    The Events that Followed Maher's Investments in Global Factors

After making the three investments in Global Factors, Maher continued to request and to

receive monthly information about the Company from Johnson.  Trial Tr. at 48:24–49:7; PX 28–

29.  Maher used the information received to update his monthly "cushion" spreadsheet.  PX 30.

By April 2019, Maher had expressed concern about the performance of the fund to Allen based

on the fact that his personal "cushion" calculations showed a "$1million drop in the funded

status over a 3 month period, [which could] be viewed as worrysome [sic] because the funded

status is no longer positive (and could be viewed as significantly negative) at the end of January

and February."  PX 31 at MAHER 000804.  Over the course of April and May 2019, Maher

continued to express concern to Johnson and Allen about the Company's performance.  PX 32–35.  Johnson sought to reassure Maher, and he offered to have a telephone conversation with Maher to explain why Maher's "cushion" calculation did not accurately reflect the performance or capitalization of the Company.  PX 35.  After Johnson shared updated financial information for May 2019, Maher informed Johnson that his "spreadsheet shows the funded status is back in the black, so no need to discuss."  PX 36.  In the months that followed, however, Maher and Johnson continued to exchange lengthy emails about the "cushion" spreadsheet, how it could be designed to most accurately represent the Company's solvency, and how the Company had been performing.  PX 37–43.  These exchanges, and regular updates on the Company's financials, continued through the end of 2019.

In early 2020, the COVID-19 pandemic hit the United States.  On March 20, 2020, Global Factors sent an email to its investors, informing the investors that it was curtailing additional purchases of accounts receivables, had put the collection of existing receivables on hold, and was suspending investor distributions for a period of ninety days.  PX 44.  Maher wrote Johnson on March 21, 2020, suggesting that Global Factors track the accrued deferred distributions for each investor, breaking out separately base distributions and Class B and Class C distributions, and that the fund manager should not take any profits or gains from investments until the accrued and deferred distributions were made.  PX 45.

On May 12, 2020, Global Factors informed its investors that, in light of the COVID-19 pandemic, it would be imposing a "slightly longer" moratorium on all interest paid to investor accounts.  PX 46.  On June 13, 2020, Maher wrote Johnson that, assuming base distributions would begin again in July or August 2020, Global Factors should address the how the imminent payment of base distributions to investors would be prioritized, and specifically, the relative

priority of accrued base distributions to Class B and Class C unitholders.  PX 47.

On September 16, 2020, Maher provided notice of his request to redeem 100% of his unreturned capital contributions plus accrued and unpaid distributions related to the first of the three investments that he made in Global Factors—the $523,000 investment made on behalf of the Maher IRA in October 2018.  PX 48.  Johnson responded acknowledging receipt of the notice and instructed Maher that he would keep Maher apprised of the redemption process.  *Id.*

Global Factors wrote to its investors on September 24, 2020, that although some of its customers had been making payments, it was still "not able to predict when redemption processing and monthly payments to investors will resume."  PX 49.  That same day, Maher wrote Johnson to inquire what redemptions had been either processed in 2020 or remained pending, and Johnson responded that there had been no redemptions and that he believed that Maher's redemption request was the only one that had been made, but that he would confirm the number of redemption requests that had been made and inform Maher with certainty.  PX 50.  Six days later, Maher wrote Johnson and asked whether he had confirmed whether other redemption requests had been made.  PX 51.  Johnson responded that four other redemption requests had been made between January and September 2020, for a total of $404,000 invested.  *Id*.

On October 15, 2020, Johnson provided notice of his intent to redeem 100% of the unreturned capital contribution plus accrued and unpaid distributions related to the second of the three investments that he made in Global Factors—the $430,000 investment made on behalf of the Trust in November 2018.  PX 52.  Johnson responded the same day acknowledging receipt of the redemption request.  *Id.*

On October 20, 2020, Global Factors wrote to its investors that it was still not able to

predict when redemption processing and monthly payments to investors would resume, but that incoming payments from customers had "ticked up" in September.  PX 53.  It also made reference to an exchange offer and recovery plan that it was finalizing for investors.  *Id.*

On November 17, 2020, Maher gave notice of his request to redeem the remainder of his investment in Global Factors—the $49,000 investment made by the Maher IRA in December 2018.  PX 54.

On November 22, 2020, Global Factors sent an email to its investors which stated that the fund would be liquidated and unwound "over a reasonable period of time," and that investors could participate in "a voluntary exchange into a newly formed entity."  PX 55.  The letter indicated that, in lieu of liquidation of their stake and distribution of the resulting funds, investors in Global Factors could exchange their Global Factors units for shares of the newly formed entity, which was named Propellus Inc.  Stipulated Facts ¶ 15; PX 55–56.  The exchange offer gave investors in Global Factors the opportunity to exchange their units in Global Factors for convertible preferred shares in Propellus based on the value of the Global Factors's assets as of November 30, 2020.  PX 56.

Maher, acting on behalf of the Maher IRA and the Trust, rejected the offer to exchange the Global Factors units for shares in Propellus, and instead chose to have the Global Factors units liquidated.  Stipulated Facts ¶ 17.

On April 8, 2021, Johnson sent Maher Global Factors's audited financial statements for the years ended December 31, 2017, and December 31, 2018.  PX 57.  Those audited financial statements showed that at the end of 2017, Global Factors had $8,412,326 of Total Assets, $10,067,583 of Redeemable Preferred Member Units, and negative $1,679,977 of Members' Equity.  PX 58 at MAHER 000216.  The audited financials also showed that by the end of 2018,

the Company had secured $10,152,238 of Total Assets, but had accumulated $16,691,189 of

Redeemable Preferred Member Units, which was offset by negative $6,621,863 of Members'

Equity.  *Id.*

After receiving the updated financials, Maher sent Johnson several emails on a variety of

subjects, including on both the SEC action against Johnson disclosed in the Private Placement

Memorandum and on the differences between the audited financials and the unaudited versions

provided to Maher prior to his investments.  First, with respect to the SEC action, Maher wrote

Johnson on April 12, 2021, that he had recently discovered that Johnson had resolved the SEC

action by entering into a settlement agreement with the SEC.  PX 60.  Johnson had in fact agreed

on January 10, 2019, without notifying Maher, Trial Tr. at 199:17–20, 376:10–16, to the entry of

a judgment in the action on a no-admit, no-deny basis, restraining him from violating federal

securities laws and ordering a civil penalty and disgorgement against him, PX 87.  The judgment,

which was entered on January 24, 2019, by the Honorable Kimba M. Wood of this District,

permanently enjoined Johnson from violating Section 10(b) of the Securities Exchange Act of

1934 and Section 17(a) of the Securities Act of 1933, and ordered him to pay a civil penalty of

$75,000 and disgorgement in an amount not to exceed $577,731 that would be determined by

Magistrate Judge Henry Pitman.  PX 87.  On the same date, Judge Wood entered a final

judgment as to American Growth Fund II ("AGF II"), one of Johnson's other entities, enjoining

it from violating Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act.

PX 86.  On January 25, 2019, the SEC issued a litigation release, stating that Johnson and AGF

II, without admitting or denying the SEC's allegations:

> consented to the entry of judgments permanently enjoining them from violating the
> antifraud provisions of Section 17(a) of the Securities Act of 1933 and Section
> 10(b) and Rule 10b-5 thereunder the Securities Exchange Act of 1934.  In addition,
> the judgement against Johnson requires that he pay a penalty in the amount of

> $75,000 and disgorgement of his ill-gotten gains and prejudgment interest.  Under
> the order, the amount of disgorgement will be decided at a later time, no later than
> 30 days, either by agreement of the parties or by referral to a magistrate judge.  The
> magistrate judge will calculate disgorgement as $577,731, less amounts paid by
> AGF Management II, LLC to unaffiliated third parties (which Johnson must prove
> by documentation), other than for Johnson's benefit.

PX 88.  Johnson was ultimately ordered to pay $302,500 in disgorgement and a $75,000 penalty.

Trial Tr. at 374.[3]  In his April 12, 2021 email to Johnson asking about the settlement, Maher

referenced a different portion of the PPM, which had disclosed that Allen was the subject of a

FINRA disciplinary proceeding in 2013.  PX 60.  Maher complained that Johnson had told him

that the complaint was that of a "typical disgruntled former investor causing trouble" and "no big

deal."  *Id.*  He also stated that he was "certainly never told there was any ongoing action against

[Johnson] and Allen."  *Id.*  Maher stated that had he "known about what was going on behind the

scenes with the SEC or the real reason [Johnson] stopped using American Growth and started

using Global Factors, [he] never would have invested in the Global Factors funds," and that he

"believe[d] the omission of material information . . . at the time [he] invested [were] most likely

actionable."  *Id.*  Maher surmised that Johnson had paid the SEC with sums taken from Global

Factors.  *Id.*

In the weeks following April 8, 2021, Maher sent Johnson numerous requests for

clarification of the discrepancies between the audited financials that Johnson shared with Maher

in April 2021 and the unaudited financials that had been provided to Maher prior to his

investments.  After several exchanges, on April 21, 2021, Maher sent Johnson a screenshot of the

original figures in his "cushion" spreadsheet for December 31, 2018, and asked why certain of

the figures differed meaningfully from the figures in the audited financials.  PX 62.  Namely,

Maher highlighted that the new figures showed "only about $10.3M in receivables (vs $19M),

---

[3] Johnson still has not satisfied the judgment.  Trial Tr. at 375.

payables of over $700K (vs $0), and almost $4M of losses on receivables (vs $365K)." *Id.*
Johnson responded the same day: "Incorrect.  The spreadsheets were real-time gross receivables.
The financials were adjusted for covid in 2020 over a year later."  PX 63.

In total, from August 2021 to June 2022, the Trust received $40,881.54 in connection
with the liquidation of its Global Class B shares, Stipulated Facts ¶ 18; PX 78, and the Maher
IRA received $65,550.63 in connection with the liquidation of its Global Class B shares,
Stipulated Facts ¶ 19; PX 76–77.

On or around October 15, 2021, Maher received a Final Disbursement Memorandum
from Propellus stating that the Maher IRA was owed payment of $67,257.35 relating to its shares
in Global Factors.  PX 74.  The memorandum contained a general release of Global Factors, its
agents, successors and assigns to be executed by Maher.  *Id.*  Maher refused to execute the
release and the Maher IRA has still not received the $67,257.35 that it asserts it is entitled to.  *Id.*
On or around October 15, 2021, Maher received a Final Disbursement Memorandum from
Propellus stating that the Trust is owed payment of $42,425.36 relating to its shares in Global
Factors.  The memorandum contained a general release of Global Factors, its agents, successors
and assigns to be executed by Maher.  Maher refused to execute the release and the Maher IRA
has still not received the $42,425.36 that it asserts it is entitled to.  PX 75.

The Maher IRA, after purchasing $523,000 worth of Global Factors shares on October
10, 2018 and an additional $49,000 worth of Global Factors shares on December 15, 2018,
received $109,683 in distributions from Global Factors and received $65,550.63 as a result of
Global Factors's liquidation.  Stipulated Facts ¶¶ 7, 10, 19.  The Trust, after purchasing $430,000
worth of Global Factors shares on November 12, 2018, received $66,650.00 in distributions from
Global Factors and $40,881.54 as result of Global Factor's liquidation.  Stipulated Facts ¶¶ 9, 11,

18.

## IV.    Wall Street Pizza

Prior to Plaintiffs' investments in Global Factors, Johnson, acting on behalf of Global

Factors, signed several Receivables Purchase Agreements with an entity called Wall Street Pizza.

Plaintiffs established by clear and convincing evidence that the Receivables Purchase

Agreements were shams.  The agreements with Wall Street Pizza provided a means by which

Johnson funneled assets belonging to Global Factors to a customer of AGF II, one of Johnson's

other entities, in discharge of AGF II's obligations to that customer, Randy Langhamer.  The

agreements purported to reflect an obligation of Wall Street Pizza to Global Factors, but in fact

did no such thing.  Johnson and Langhamer had a secret understanding that Wall Street Pizza

would not pay Global Factors and that the agreement was intended solely to camouflage the

return of funds from AGF II to Langhamer.

In total, Defendants signed five agreements with Wall Street Pizza, resulting in

cumulative principal distributed to Wall Street Pizza of $295,000.  Trial Tr. at 437:12–23.  At

least two of those agreements were future receivables purchase agreements.  The first was dated

July 19, 2017; on its face, it provided that Global Factors would distribute to Wall Street Pizza

$75,000 in purported exchange for $85,000 of futures accounts receivable.  Trial Tr at 414;

PX 89.  The second was dated August 8, 2018; on its face, it provided that Global Factors would

pay Wall Street Pizza $35,000 for $38,000 worth of receivables.  Trial Tr. at 436.  A third

agreement purported to establish a loan from Global Factors to Wall Street Pizza for $140,000.

Trial Tr. at 437:15–18.

The agreements had a veneer of legitimacy.  They ostensibly gave Global Factors the

right to debit from Wall Street Pizza daily, at Global Factors's discretion, a sum calculated as a

flat fee or a specified percentage of Wall Street Pizza's daily revenue until the loan was repaid at

the expense that, if Wall Street Pizza did not do so, an Event of Default would follow.  Such default would give Global Factors the right to terminate the agreement for cause and to immediately collect, within three business days, the total amount of the loan outstanding less any monies already received from Wall Street Pizza.  The August 8, 2018 agreement, for example, stated that Global Factors was entitled to deduct the sum of either $216.75 or twenty-five percent of Wall Street Pizza's settlement amounts due from each transaction daily at the risk that, if it did not do so, Global Factors would collect $38,000 from the loan of $35,000.  Wall Street Pizza represented and warranted that it had furnished financial statements to Global Factors and that such financial statements were "accurate and fairly represent[ed] the financial condition of" Wall Street Pizza at the date of the financial statements, and that there had been no material adverse changes to Wall Street Pizza's business in the interim.  PX 89 § 2.06.  Wall Street Pizza also warranted and represented that it had been operating its business at its present location for at least the twelve consecutive months prior to the Effective Date of the agreement.  *Id.* § 2.05.

But, as Johnson and Global Factors understood and agreed, the agreements were shams.  They did not reflect real obligations and they were never intended to be enforced.  The testimony of Randy Langhamer, the principal owner of Wall Street Pizza, was credible and compelling.  He invested $2.4 million in AGF II from his IRA, his joint accounts with his wife, his kids' college funds, and the savings of his elderly mother.  Trial Tr. at 449.  Johnson and AGF II did not honor his redemption request when he sought to withdraw his money from AGF II because Johnson did not have the money to repay Langhamer from AGF II.  Trial Tr. at 435, 437.  Instead, Johnson first offered Langhamer a loan from Global Factors.  When Langhamer refused to accept the loan, Johnson simply gave him the money from Global Factors as an offset against what Langhamer was owed from AGF II.  Trial Tr. at 435.  In other words, Johnson used Global

19

Factors's funds secretly to discharge an obligation AGF II owed to Langhamer.  As Langhamer put it in testimony, the agreement between him and Johnson was not for the purchase of receivables.  Trial Tr. at 453.  Global Factors would not collect anything in exchange for the money it gave Langhamer.  It was understood between Johnson and Langhamer that "it was a redemption, a partial redemption payment," but one that was designed to present "as a performing loan."  Trial Tr. at 453.  Langhamer did not even read the agreements before his wife signed them.  Trial Tr. at 452.

Langhamer's testimony was corroborated by the objective evidence presented at trial by Plaintiff, as well as by the absence of any contrary evidence.  Wall Street Pizza had not even opened for business at the time the receivables agreements were entered into.  Trial Tr. at 414.  It would not open until nearly half a year later, on March 17, 2018.  As a further demonstration of the sham nature of the agreements, Langhamer did not provide any financial statements to Global Factors.  Trial Tr. at 434.  He did not do so because Wall Street Pizza would never pay anything to Global Factors.  He was unable to do so because Wall Street Pizza did not have receivables on its books and was not obtaining receivables eight months prior to its opening.  Trial Tr. at 434.  In fact, Wall Street Pizza has no receivables, so it is implausible that Johnson and Global Factors reached an agreement to extend financing to Wall Street Pizza for its receivables.  Trial Tr. at 439.  Ultimately, it never received any receivables.  Additionally, while the agreements stated that Global Factors would have collateral on other assets of the "merchant," there was no discussion of what other assets Wall Street Pizza possessed at the time of contract execution.  Trial Tr. at 439–440, 448, 452.

As a result, Langhamer never repaid any money to Global Factors and understood from Johnson that he never would have to make any payment to Global Factors.  Trial Tr. at 436–37,

439.  Nor has Johnson or Global Factors been able to produce evidence of a UCC-1 filing being made against Wall Street Pizza by Global Factors.  Trial Tr. at 439.  While the agreements state that Global Factors would have collateral on other assets of the "merchant," there was no discussion of what other assets Wall Street Pizza possessed at the time of contract execution.  Trial Tr. at 439–40, 448, 452.  No confession of judgment has been entered against either Langhamer or his wife, who was the signatory to the agreements.  Trial Tr. at 440.  The ostensible "debt" that Wall Street Pizza owed to Global Factors was retired, not through the receipt of receivables, but by Johnson reducing on the books of AGF II the amount that that entity owed Langhamer by the amount Johnson had paid Langhamer from Global Factors.  Trial Tr. at 441, 444–45.  In other words, in 2021, Johnson unilaterally reduced Langhamer's balance owed from AGF II of $2.4 million by $295,000 and then reduced the remaining balance by 85%.  Trial Tr. at 444, 446.

Johnson disputed Langhamer's testimony, but Johnson's testimony was not credible.  Johnson testified that he had filed UCC-1s for Wall Street Pizza's assets, Trial Tr. at 317–18, 408, but he resisted providing such documents in discovery and did not produce any at trial.  The Court draws an adverse inference against Global Factors with respect to evidence that, if it existed, was under Global Factors's control and not reasonably available to Plaintiffs,[4] and that clearly was material to the issues at trial.  3 Fed. Jury Prac. & Instr. § 104:26 (6th ed. 2024) ("If a party fails to produce evidence under that party's control and reasonably available to that party and not reasonably available to the adverse party, then you may infer that the evidence is

---

[4] Johnson testified that the UCC filings were made by its third-party filing company and were anonymous and that someone would have to know the name of the contract holder that Global Factors entered into in order to find the UCC filing.  Trial Tr. at 409–10.  Johnson also testified that Defendants protested to producing the UCC filings in discovery because they were "public filing[s]."  Trial Tr. at 319:22–23.

unfavorable to the party who could have produced it and did not."); *Zimmerman v. Assocs. First Cap. Corp.*, 251 F.3d 376, 383 (2d Cir. 2001).  There is every reason to believe that no such UCC-1s exist for Wall Street Pizza or any other person from whom Global Factors purportedly purchased assets.

Johnson's testimony regarding the collection of the settlement amounts was vague and evasive.  Trial Tr. at 407–08.  Johnson testified falsely about the financial statements he received from Wall Street Pizza.  Trial Tr. at 322.  He testified that he looked at the financial statements of customers such as Wall Street Pizza to determine whether or not to purchase their receivables and that Langhamer put on his application that he had one million dollars in receivables.  Trial Tr. at 322.  But Langhamer testified credibly that, at the time of the application, the store was not open and it had no receivables and Johnson—the party who would have the application— produced no evidence to the contrary.  While acknowledging that Global Factors had not sought to collect anything from Wall Street Pizza on the supposed receivables purchase for six years, Trial Tr. at 321, Johnson claimed that he had had a collections agency file a lawsuit against Wall Street Pizza, Trial Tr. at 320.  But that lawsuit—filed in or around August 2023, several months ago and well into this litigation—has every hallmark of being a pretense.  Trial Tr. at 320. Johnson's actual conduct is consistent with Langhamer's characterization of the agreement as a document that was intended to create the appearance of a receivables purchase without actually functioning in that manner.

Johnson's answer that Global Factors did not need to collect anything from Wall Street Pizza is defective several times over.  There is no evidence that AGF II treated the monies it owed to Langhamer as monies owed to Global Factors.  To the contrary, when AGF II finally forced Langhamer to exchange his interests for shares of Propellus, it did not treat the funds

supposedly advanced to Langhamer as collateral for the benefit of Global Factors.  It simply reduced the amount AGF II owed Langhamer by the amount it had already paid him from Global Factors.  In short, the facts adduced at trial fully support a finding that Global Factors paid Wall Street Pizza $295,000 from investor funds contributed to Global Factors in satisfaction of an obligation that Johnson, through AGF II, owed to Wall Street Pizza's owners in connection with an investment that those owners made in AGF II.

### CONCLUSIONS OF LAW

Plaintiffs bring claims against Defendants for: (i) violations of Section 10(b) of the Exchange Act, 15 U.S.C.§ 78j(b), and Securities and Exchange Commission Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5(b), Dkt. No. 7 ¶¶ 69–76, and against Johnson for control-person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).; (ii) violations of Section 20(a) of the Exchange Act, *id.* ¶¶ 77–81; (iii) negligent misrepresentation, *id.* ¶¶ 82–88; and (iv) fraud, *id.* ¶¶ 89–94.  Plaintiffs bear the burden of proving every element of every claim, and on the issue of damages.  "[Plaintiffs] must prove by a preponderance of the evidence that defendants violated the Exchange Act."  *Marini v. Adamo*, 995 F. Supp. 2d 155, 178 (E.D.N.Y. 2014).  Plaintiffs must also prove their negligent misrepresentation claim by a "preponderance of the evidence," *Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*, 392 F. Supp. 3d 382, 402 (S.D.N.Y. 2019); *see Tuckett v. Slade Indus., Inc.*, 2018 WL 3910821, at *5 (S.D.N.Y. Aug. 14, 2018), but must prove each element of its fraud claim by "clear and convincing evidence," *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007).

The Court concludes that Defendants are liable to Plaintiffs under the Exchange Act and for common law fraud.

I.      **Securities Exchange Act**

Plaintiffs allege that Defendants made four sets of misrepresentations or omissions in order to induce Plaintiffs to invest in Global Factors that give rise to liability under the Exchange Act.  First, Plaintiffs allege that Defendants overstated Global Factors's earnings by stating that Global Factors earned a twenty-seven percent annual return on its syndication agreements, and that the syndication agreements provided for a one-year term.  Second, Plaintiffs allege that Defendants overstated Global Factors's ability to meet its obligations to investors by presenting to Maher a balance sheet as of December 31, 2017 that showed assets exceeding liabilities by more than $823,000, which was later contradicted by an audited balance sheet for the period that showed liabilities exceeding assets by over $1,655,000.  Third, Plaintiffs allege that Defendants deliberately withheld and misrepresented material information regarding the SEC action against Johnson and AGF II that was pending while Plaintiffs were considering investing.  Finally, Plaintiffs allege that Defendants misled them regarding the nature of the business that Global Factors was engaged in, how investor funds were utilized, and the security backing Global Factors's acquired receivables.[5]

---

[5] The Court notes that although it was discussed at trial and in Plaintiffs' pretrial papers, Plaintiffs do not bring a claim based upon the statement in the Global Factors private placement memorandum that, "[t]he Operating Agreement provides that the Company shall prepare: (i) within 120 days after the end of each Fiscal Year, annual audited financial statements of the Company with respect to such year, (ii) within thirty (30) days after the end of each calendar quarter, an audited quarterly statement of operations with respect to such quarter and (iii) such other operating reports as shall be reasonably requested by any Member; provided that such reports only require information available to the Manager without unreasonable expense."  PX 7 at MAHER 000433.  In August 2018, when asked by Maher—who had received the private placement memorandum and was contemplating an investment in Global Factors—for Global Factors's previous two annual audited financial reports, Johnson responded that the 2017 audited financials were "being prepared," even though it was more than 120 days after the end of Global Factors's 2017 fiscal year.  PX 8 at MAHER 000491.  Such apparent failure to timely produce financial statements appears to be similar to the facts that gave rise to the SEC complaint disclosed in the private placement memorandum, which describes the complaint as follows:

Section 10 of the Exchange Act makes it unlawful for any person acting directly or indirectly:

> To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5, promulgated thereunder, further establishes that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,
> >
> > (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> >
> > (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.  To recover damages for violations of Section 10(b) of the Exchange Act

---

The complaint alleges that versions of the private placement memorandum used by the Affiliate in its offering of securities stated that the Affiliate's financial statements would be audited and made available to investors within 90 days of the end of the calendar year being audited, when in fact audited financial statements were not completed until 2014.  The complaint also alleges that the Affiliate (i) made misrepresentations in versions of such memorandum about its management, and (ii) provided statements to investors that lacked sufficient disclosure regarding the underlying performance of transactions that allegedly could materially adversely impact such entity and its investors' investments therein.  The complaint further alleges that PAA and its President and Chief Compliance Officer were aware of the alleged inaccuracies and continued to use versions of such memorandum to solicit investments in the Affiliate.

PX 7 at MAHER 000435.  Even so, Maher was aware that Johnson had not prepared the audited financial statements for 2017 in accordance with the representation in the private placement memorandum, precluding a finding that Maher reasonably relied upon the representation in the private placement memorandum that audited financial statements would be prepared within 120 days of Global Factors's fiscal year-end in deciding to invest in Global Factors.

and Securities and Exchange Commission Rule 10b-5(b), a plaintiff must prove each of the following six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014); *see Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011); *Stoneridge Inv. Partners, LLC v. Sci.–Atlanta*, 552 U.S. 148, 157 (2008); *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 n.23 (2d Cir. 2017).

"'The test for whether a statement or omission is materially misleading' . . . is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004)). This test is objective and looks to the understanding of the "ordinary investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015). Moreover, under the federal securities laws, "literal accuracy is not enough. An issuer must also desist from misleading investors by saying one thing and holding back another." *Id.* at 192. "[S]o-called 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud." *S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, 548 U.S. 442 (2013); *see Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024) (holding that Section 10(b) "covers half-truths"). However, a duty of disclosure exists "only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5(b)). "Even when there is no existing independent duty to

disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).

To be actionable, a misrepresentation or omission also must be material, *i.e.*, a plaintiff must allege facts showing that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)). Thus, "[i]n judging whether an alleged omission was material in light of the information already disclosed to investors, [the court] consider[s] whether there is 'a substantial likelihood that the disclosure of the [omitted material] would have been viewed by the reasonable investor as having significantly altered the total mix of information [already] made available.'" *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

In addition, "[t]o establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citation and internal quotation marks omitted); *see also Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (noting the scienter required under Section 10(b) and Rule 10b–5 to sustain a private civil claim is an "an intent to deceive, manipulate or defraud" (quoting *Ganino*, 228 F.3d at 168)). "A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the 'motive and opportunity' to commit the alleged fraud, or (2) constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 317 (S.D.N.Y. 2021) (quoting *ECA v. JP Morgan Chase*, 553 F.3d 187,

198 (2d Cir. 2009)).  Proof of scienter "can be and customarily is presented through circumstantial evidence." *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 495–96 (S.D.N.Y. 2005).  "Whether or not a given intent existed, is, of course, a question of fact." *Marini*, 995 F. Supp. 2d at 191 (quoting *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1469 (2d Cir. 1996)).

Plaintiffs must also demonstrate reliance on the alleged misstatement or omission or transaction causation.[6]  This element requires a showing "that but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001).  Further, "[n]ot all reliance is sufficient to demonstrate liability under the Exchange Act.  Instead, the reliance must be 'reasonable' or justifiable.'" *Marini*, 995 F. Supp. 2d at 192 (quoting *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 542 F. Supp. 2d 266, 267 (S.D.N.Y. 2008)).  "In assessing the reasonableness of a plaintiff's alleged reliance, [courts] consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343

---

[6] Plaintiffs bear the burden of demonstrating a connection between the misrepresentation or half-truth and the purchase or sale of a security.  "[D]istrict courts have found that when an alleged misrepresentation concerns the value, nature or investment characteristics of the securities at issue, it satisfies the in connection with requirement." *Louros v. Kreicas*, 367 F. Supp. 2d 572, 588 (S.D.N.Y. 2005) (citations and internal quotation marks omitted).  Here, all of the alleged misstatements or half-truths were made in the context of Maher's contemplated investment in Global Factors.  The Court thus finds that this requirement is straightforwardly satisfied with respect to each of the alleged misrepresentations.  *See United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1221 (10th Cir.2000) ("The representations allegedly were made to induce UIH to purchase the option.  As such, the misrepresentations were made to influence UIH's investment decision and were made in connection with the purchase or sale of a security."), *aff'd*, 532 U.S. 588 (2001); *Troyer v. Karcagi*, 476 F. Supp. 1142, 1147 (S.D.N.Y. 1979) (holding the connection element satisfied "because the misrepresentations and omissions allegedly induced" plaintiffs' actions).

F.3d 189, 195 (2d Cir. 2003).  The following factors inform whether a plaintiff's reliance was reasonable:

> (1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993).

Next, Plaintiffs must demonstrate that they suffered economic loss.  Here, Plaintiffs assert, and Defendants do not controvert, that Plaintiffs invested a total of $1,002,000 in Global Factors, and that Plaintiffs received a total of $173,082.17 in distributions and liquidation proceeds from Global Factors.  *See* Stipulated Facts ¶¶ 8–12, 18–19.  The Court thus finds that Plaintiffs suffered an economic loss in satisfaction of that element of the Exchange Act analysis.

Finally, Plaintiffs must demonstrate a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (citation and internal quotation marks omitted); *Mfrs. Hanover Tr. Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 22 (2d Cir. 1986) ("The standard for liability in a civil action under section 10(b) is causation not merely in inducing the plaintiff to enter into a transaction or series of transactions, but causation of the actual loss suffered.").  The Exchange Act makes a remedy available "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharms., Inc. v. Brouda*, 544 U.S. 336, 345 (2005).  It thus is not sufficient that the misrepresentation "touch upon" a loss even in the sense that it is a "necessary condition of any such loss." *Id.* at 344.  "To establish loss causation, Plaintiffs must show that 'the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Abramson v.*

29

*Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) (quoting *In re Vivendi*, 838 F.3d at 261); *see also Lentell*, 396 F.3d at 173 ("Put another way, a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor.").  To meet this standard, "a plaintiff can allege either (1) 'the existence of a cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud' or (2) 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'"  *Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *25 (S.D.N.Y. Mar. 29, 2021) (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233–34 (2d Cir. 2014)).  Plaintiffs may make a showing of loss causation by demonstrating that "(1) defendants concealed a foreseeable risk associated with a securities transaction between plaintiffs and defendants; and (2) the foreseeable risk occurred causing plaintiffs' loss."  *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 305 (S.D.N.Y. 2005) (citing *Mfrs. Hanover Tr. Co.*, 801 F.2d at 22 and *Weiss v. Wittcoff*, 966 F.2d 109, 112 (2d Cir.1992)), *aff'd sub nom. Tenney v. Credit Suisse First Boston Corp., Inc.*, 2006 WL 1423785 (2d Cir. May 19, 2006) (summary order); *see also Mfrs. Hanover Tr. Co.*, 801 F.2d at 21 (upholding jury charge instruction regarding loss causation where the judge noted the requirement "that the damage was either a direct result of the misleading statement or one which could reasonably have been foreseen").

### A.    Revenue Profile

Plaintiffs first allege that Defendants misrepresented Global Factors's revenues when Defendants stated that Global Factors earned "in excess of 24% annually on its investments (and specifically in excess of 27% for certain participation-agreement investments), which allowed Global to distribute 12% or more each year to its investors as interest."  Dkt. No. 40 at 13.

Plaintiffs have satisfied their burden of showing a misstatement but have failed to show a

material misstatement made with scienter.

Specifically, Plaintiffs point to an email from Johnson to Maher dated August 10, 2018,

in which Johnson stated:

> We purchase receivables anywhere between 67 and 72% of face value on average
> per year and collect on most contracts on a daily basis (35% or higher gross IRR).
> A small percentage are collected weekly and one or two are collected monthly.  On
> the other hand, our investors collect 12%, paid monthly at the highest frequency,
> and most reinvest. Good for both of us.  They compound 12 times per year, we
> compound more than that.  Powerful numbers.

PX 10.  Plaintiffs also point to an email from Johnson to Maher dated August 22, 2018, in which

Johnson stated:

> [T]he syndication Agreements are one year revolving term.  It's a constant one-year
> agreement similar to others we have had in the past in effect for many many years
> end-to-end.  The idea is to keep the money at work in perpetuity to ensure constant
> flow of the 27% fee annually.  Due to the constant flow of existing and new
> customer request for funding this is a relatively easy feat to accomplish in
> syndication.

PX 18.  Plaintiff alleges that these representations are inconsistent with a note on Global

Factors's accounting policies in its audited financial statements from 2017 and 2018, which were

not provided to Maher until April 2021, after he made the investments in Global Factors.

Specifically, the audited financial statements contain a note regarding revenue recognition,

which states that:

> The company generates revenue by purchasing the future receivables of small
> businesses (direct funding) or by advancing money to a financing company and
> collecting a stated financing fee (participation funding).  . . . Participation funding
> represents funds that are advanced [to] two different financing companies.  One
> financing company provides a 27% per annum financing fee and such fee income
> is earned and accrued during the year.  Two-thirds (2/3) of the earned financing fee
> is paid quarterly to [Global Factors] and the remaining one-third (1/3) of the fee
> and the cash advance are payable at maturity, which is 24 months from the date of
> the advance.  The other financing company provides a 19% per annum financing
> fee, this fee income is payable in full monthly to [Global Factors].

PX 58 at 9.

Plaintiff has established that Johnson's representations about Global Factors's earnings in the August 22, 2018 email were not accurate at the time that they were made.[7]  There are factual discrepancies between the information provided by Johnson to Maher in the August 22, 2018 email and the note within the audited financials.  First, Johnson responds flatly to Maher's request for the average duration of the loan agreements that "the syndication [a]greements are one year revolving term."  PX 18.  That response was untrue with respect to at least one of the two loan agreements, which, as explained by the note in the financial statements, stated that maturity of the loan was twenty-four months from the date of the loan.  PX 58 at 9.  Johnson himself admitted so at trial.  Trial Tr. at 214:3–4 ("The 12 months as the average duration remaining on the assets for the fund is incorrect.").  Second, Johnson states that the fee received on "the syndication [a]greements," referred to in plural, resulted in a "constant flow of the 27% fee annually."  PX 18.  According to the note in the financial statements, however, only one of the loan agreements provided for a twenty-seven percent fee.  Johnson, in response to a request for the syndication fees/income, omitted to also mention the second agreement that provided for a nineteen percent fee.

But Plaintiffs have not proved that the discrepancy between the one-year duration of the syndication agreements stated by Johnson and the actual two-year term of at least one of the syndication agreements was material.  There is no evidence that the discrepancy would have been important to a reasonable investor considering whether to make an investment decision.

---

[7] Plaintiff does not identify any manner in which the email sent by Johnson to Maher on August 10, 2018 is contradicted by the note on revenue recognition contained in the audited financials.  The full note on revenue recognition does not provide a precise or even an estimated discount to face value at which Global Factors purchased future receivables during the period, a precise or estimated internal rate of return ("IRR"), or a precise or estimated value for distributions to investors.  *Compare* PX 10, *with* PX 58 at 9.

Johnson made clear to Maher that Global Factors planned to continue to roll the syndication agreements forward, so the return of principal, whether nominally scheduled to occur at the end of a single year or after two years, was immaterial.  If anything, the understatement of the term of the agreement, which still provided for a twenty-seven percent annual fee, actually undersold the stability of Global Factors's future cash flows.  Put differently, Johnson expressed that the customer was locked in for only one year, when in fact, if the audited statements are correct, Global Factors had secured multiple-year commitments of the same size.  Maher himself testified that he requested the information so that he could discount the value of Global Factors's future cash flows back to the present and compare that value to the value of Global Factors's liabilities. Trial Tr. at 31:18–32:5.  The total duration of the agreements would have been irrelevant to such calculation.

The misrepresentations with respect to the magnitude, rather than the duration, of Global Factors's revenue are arguably material in two respects.  Johnson omitted to state that only one of the syndication agreements provided for a twenty-seven percent annual fee, and that there was another syndication agreement which provided for a nineteen percent fee.  Johnson also omitted to state that the twenty-seven percent fee provided for a payment schedule such that only two-thirds of the twenty-seven percent fee would be paid quarterly to the Company and the remaining third was due only at the conclusion of the two-year term.  These omissions arguably constituted half-truths.  The falsity of a statement is not alone to be judged by the literal accuracy of the words spoken when viewed in isolation but the meaning they would have conveyed when viewed in context.  *See In re AppHarvest Sec. Litig.*, --- F. Supp. 3d ----, 2023 WL 4866233, at *38 (S.D.N.Y. July 31, 2023).  The day before Johnson sent the email at issue, Johnson sent an email to Maher in which he stated that Global Factors secured its syndication agreements by

"negotiat[ing] a set fee from the lead buyer which is *usually around* 27% annually." PX 18 at MAHER 000593. But after receiving that email, Maher followed up with the specific request for the "syndication fees/income" and the "average duration ([should be] dollar-weighted, I think) of the remaining term on the loan/syndication agreements." *Id.* at MAHER 000592. Just hours after receiving Johnson's response containing the alleged misrepresentations, Maher responded that he had added to his performance-tracking spreadsheet "27% for the receivable income for the syndication," and that he had "put 12 months as the average duration remaining on the loans/assets for the funds." *Id.* at MAHER 000598. In that context, Johnson omitting the facts that one syndication agreement provided for a fee of only nineteen percent and that another provided for only two-thirds of the annual payment amount to be paid over the first year of the agreement would have served to lead Maher to input distorted information into his spreadsheet and constituted a half-truth, creating a skewed picture of Global Factors's financial performance.

Even so, the Court finds that Plaintiffs have not carried their burden that Defendants acted with the requisite scienter when making such representations about Global Factors's revenue profile. Johnson clearly had both motive and opportunity to perpetrate the alleged fraud given his efforts to solicit an investment from Plaintiffs. But Plaintiffs have made no showing that Johnson intentionally made a false statement with respect to Global Factors's revenue profile. Before the alleged misstatement, Johnson made clear to Maher that the twenty-seven percent fee was due only annually and, after the alleged misstatement, Johnson told Maher that there was no way for Maher to make the comparison he was seeking to make. PX 20 at MAHER 000606. If Johnson were intending to deceive, he would hardly have made those statements. The Court therefore finds that Plaintiffs have failed in their burden to show that Defendants

made a materially false statement with scienter upon which they relied with respect to the Company's revenue profile.

### B.     Ability to Meet Obligations to Investors

Plaintiffs also allege that Defendants materially misrepresented the ability of Global Factors to meet its payment obligations to investors "by providing financial statements to Maher prior to investing reflecting Global's total assets exceeding its obligations to investors by over $823,000 as of December 31, 2017," which were later "contradicted by audited reports for December 31, 2017, prepared in August 2020—22 months after Maher's initial purchase of Global Class B shares—that show Global's obligations to investors exceeded its total assets by over $1,655,000."  Dkt. No. 40 at 13.  Plaintiffs have failed to demonstrate that they relied upon the alleged misstatement or that it was made with scienter.

Plaintiffs' claim is based on the unaudited balance sheet that the Customer Support Department at Global Factors provided Maher on August 14, 2018 for the year ended December 31, 2017 (the "Unaudited 2017 Balance Sheet").  *See* PX 12.  The Unaudited 2017 Balance Sheet showed that Global Factors total assets were $9,810,445.47, and its total liabilities were $8,986,700.95, resulting in total equity of $823,744.52.  *Id.* at MAHER 000550.  Several years later, after Plaintiffs had invested in Global Factors, Global Factors provided Maher an audited balance sheet for the year ended December 31, 2017 (the "Audited 2017 Balance Sheet").  *See* PX 58.  The figures for 2017 were restated.  *See* PX 58 at MAHER 000216.  The Audited 2017 Balance Sheet showed total assets for Global Factors of $8,412,326 for the year ended December 31, 2017 and redeemable preferred member units of $10,067,583, resulting in a total members' deficiency of $1,655,257.  *Id.* at MAHER 000216.  A footnote to the audited financial statement explained that Global Factors had determined to restate the 2017 balance sheet so that the presentation would be consistent with the Company's presentation of its 2018 results.  *Id.* at

35

MAHER 000223.  It stated: "In order to clarify the preferred member unit investments into the Company, management has determined that the presentation of the gross amount contributed by the preferred members (which includes re-invested preferred returns) should be reflected gross on the balance sheets, so as to correspond to the capital account balance on the members' individual income tax reporting statements (Schedule K-1)."  *Id.*  As a result, the amount presented as the Company's obligations to its investors as of December 31, 2017—the redeemable preferred member units—increased by $1,134,415.  *Id.*

The Unaudited 2017 Balance Sheet initially provided to Maher misrepresented Global Factors's obligations to investors.  As the restated financial statements acknowledged, sums due to unitholders that unitholders chose to reinvest in Global Factors represented liabilities to the members.  They were not equity (representing the residual return to the owners of Global Factors after deducting liabilities from assets), but rather, they were an obligation that Global Factors would have to satisfy before any equity remained for the Company's shareholders.  Even so, they were included in the Unaudited 2017 Balance Sheet within the equity section, rather than the liabilities section.  *See* PX 58 at MAHER 000223.  That error was not merely one of geography on the financial statements but left the reader with a simply incorrect view of the Company's ability to meet its obligations to its investors.  As the note to the audited financial statement explained, "[t]he effect of these adjustments was an increase in the amount presented as redeemable preferred member units of $1,134,415 as of December 31, 2017," and "an increase in members' deficiency of $1,134,515 as of December 31, 2017."  *Id.*  Put differently, the effect of the methodological change was that Global Factors's liabilities were later shown to be larger, and its equity was shown to be lower.

The Court also finds that the misrepresentation was material.  A reasonable investor would have considered a more than ten percent understatement of the obligations that Global Factors owed to its unitholders to have altered the mix of information available while evaluating an investment in Global Factors.  Crucially, the Unaudited 2017 Balance Sheet showed that the Company's assets exceeded the Company's obligations to its investors by more than $800,000.  *See* PX 12 at MAHER 0005500.  The Audited 2017 Balance Sheet, however, showed the Company's obligations to its investors exceeding the Company's assets by more than $1.6 million.  *See* PX 58 at MAHER 000216.[8]  Thus, the effect of the misstatement was to leave the reader with the impression that the Company's assets exceeded its obligations to its investors when, in reality, the Company's obligations to its investors exceeded its assets.

The Court does not find, however, that the misstatement was made with scienter or that Maher relied upon the Unaudited 2017 Balance Sheet in determining whether to invest in Global Factors.  To prove scienter under the Exchange Act, Plaintiffs must identify "someone whose intent could be imputed to the corporation [who] acted with the requisite scienter."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  Plaintiffs did not adduce facts that Johnson himself had the requisite knowledge to establish scienter.  They did not ask him questions or offer any other evidence that he had a role in the preparation of the Unaudited 2017 Balance Sheet, that he ever had discussions with Maher about the relevant figures presented in that balance sheet, or that he knew at the relevant time or was

---

[8] Although the restated financials did also include a lower figure for total assets—explaining to some extent why the excess of assets over obligations in the Unaudited 2017 Balance Sheet shifted to a deficit in the Audited 2017 Balance Sheet—the revised figure for obligations to investors in the Audited 2017 Balance Sheet ($10,067,583) exceeded even the initial figure for assets included in the Unaudited 2017 Balance Sheet ($9,810,445.47).  *Compare* PX 58 at MAHER 000215, *with* PX 12 at MAHER 000550.  The misstatement of the Company's obligations to investors was therefore alone sufficient to qualify as material.

reckless in not knowing of the inaccuracy contained in it.  Indeed, Plaintiffs presented no evidence whatsoever as to how either the Unaudited 2017 Balance Sheet or the Audited 2017 Balance Sheet were prepared.  And, while material, the Court cannot say that the error was "so dramatic" that it gives rise alone to an inference of corporate scienter.  *Dynex*, 531 F.3d at 196 (internal citations and quotations omitted).  Indeed, far from concealing the error, prior to Maher making any investment in Global Factors, Johnson provided to Maher additional documents to Maher that did not contain the misrepresentation.  *Compare* PX 12 at MAHER 000552 (showing that member balances totaled $13,757,967.13), *with* PX 14 at MAHER 000563 (email to Maher dated August 15, 2018 showing long-term liabilities of $11,997,232.95), *and* PX 20 at MAHER 000608 (email to Maher dated August 22, 2018 showing long-term liabilities of $13,757,967.17).  That circumstantial evidence thus does not prove that either Johnson or Global Factors intended to provide to Maher an inaccurate depiction of the Company's obligations to its investors.

As to reliance, first and most centrally, there is no evidence that Maher relied on the Unaudited 2017 Balance Sheet.  Maher began the analysis of his crucial "cushion" spreadsheet, referred to often in emails to Johnson and at trial, with the period ending June 30, 2018.  *See* PX 17 at MAHER 000591.  Maher's questioning about the Company's financial performance and status focused on the period ending June 30, 2018 and thereafter, and did not include questions regarding the 2017 Unaudited Balance Sheet.  Indeed, Plaintiffs have offered no evidence that the Unaudited 2017 Balance Sheet at all factored into Maher's analysis of the Company as he considered whether to invest in Global Factors.

Second, Maher compiled the initial draft of this cushion spreadsheet using liabilities data not from one of the Company's internal balance sheets, but rather, from a separate spreadsheet containing member balances that did not—at the time that Maher first prepared his cushion

spreadsheet—match the Company's internal balance sheet.  On August 14, 2018, a representative of Global Factors sent Maher a spreadsheet containing the investment balances of the unitholders of Global Factors as of June 30, 2018, which showed that the investor balances totaled to $13,757,967.13.  *See* PX 12 at MAHER 000552.  The following day, August 15, 2018, a representative of Global Factors sent Maher an unaudited balance sheet for Global Factors as of June 30, 2018, which showed that liabilities were $11,997,232.95.  *See* PX 14 at MAHER 000563.  Nearly a week later, on August 21, 2018, Maher first sent Johnson a draft of his crucial cushion spreadsheet, which included an entry for Member Account Balances of "$13,767,967," a figure that nearly perfectly matched the investment balances spreadsheet, but did not match the internal balance sheet.  *See* PX 17 at MAHER 000591.[9]  It was not until after Maher first sent his cushion spreadsheet that the internal balance sheet for June 30, 2018 was revised, *see* PX 20 at MAHER 000608 (email from Johnson to Maher on August 22, 2018 containing a revised internal balance sheet for June 30, 2018), to match the internal spreadsheet tracking investor balances, PX 12 at MAHER 000552.  The evidence therefore suggests that Maher did not begin using the Company's internal balance sheets to compile his cushion spreadsheet until after the methodological flaw underlying the misstatement was corrected.

### C.    SEC Complaint

Next, Plaintiffs allege that Defendants intentionally misstated information regarding the SEC action filed against Johnson, which ultimately culminated in the entry of a consent judgment against Johnson in the United States District Court for the Southern District of New York.  Dkt. No. 40 at 13.  Plaintiffs allege that prior to their investment, Johnson "downplayed

---

[9] It was not until after Maher first sent his cushion spreadsheet that the internal balance sheet for June 30, 2018 was revised, *see* PX 20 at MAHER 000608, to match the internal spreadsheet tracking investor balances, PX 12 at MAHER 000552.

the SEC's action and assured Maher that it was related to a typical disgruntled investor and that there was nothing for Maher to be concerned about."  Dkt. No. 7 ¶ 60; *see also* Trial Tr. at 11:7–10, 152:1–3; PX 60.  Maher testified that he asked Johnson over the phone, after seeing a reference to the SEC complaint in the private placement memorandum, "what's the deal with this SEC complaint?"  Trial Tr. at 11:7.  According to Maher, Johnson responded, "it's nothing to worry about.  It's just a typical disgruntled investor."  Trial Tr. at 11:8–9.  After Maher had submitted the redemption requests, on April 12, 2021, Maher sent an email to Johnson purporting to recount their initial conversation about the SEC Complaint.  Trial Tr. at 88:13–23. Maher stated:

> You told me it was the typical disgruntled former investor causing trouble, it was no big deal, it was in the past, and when I asked if there was anything else, I was told no.  In addition, when I asked why you had started Global Factors and stopped selling the prior fund (American Growth), you told me that the operating agreement for that fund didn't allow for daily collections, so you had to start a new fund.  I was never told the prior fund was tainted.  And I was certainly never told there was any ongoing action against you and Howard—an amazing omission from my view (and I'm guessing others would view it the same way).

> Based on the timing of these SEC actions, Howard and you must have been in the thick of it at the time I invested.  Had I known about what was going on behind the scenes with the SEC or the real reason you stopped using American Growth and started using Global Factors, I never would have invested in the Global Factors fund.

PX 60.  Plaintiffs also point to the language in the private placement memorandum describing the SEC complaint, which, after describing the allegations made by the SEC, states that "Mr. Johnson believe[s] the allegations in the complaint are without factual merit and plan to vigorously defend themselves against the allegations."  PX 7 at MAHER 000435.  Plaintiffs allege that such representations were misleading about the nature of the SEC action and about Johnson's intent to vigorously defend against the action because "following Maher's three

40

investments in Global, the Honorable Kimba M. Wood of this Court entered judgments against Johnson and AGFII, upon their consent, relating to the SEC complaint."  Dkt. No. 7 ¶ 61.

Johnson contests Maher's characterization of their conversation regarding the SEC complaint, and that the description of his intention to defend against the complaint was misleading.  Johnson asserts that he did not tell Maher that the SEC complaint was based upon the allegations of a disgruntled investor, and that the complaint "was born out of an inquiry from the broker-dealer investigation unit that escalated into a complaint."  Trial Tr. at 372:4–6.  Johnson emphasizes that the complaint could not have arisen from a disgruntled investor because "there [were] no investor complaints in AGF II."  Trial Tr. at 8–9.

Plaintiffs have not carried their burden to prove that Johnson made material misrepresentations to Maher regarding the SEC complaint prior to Maher's investment in Global Factors.  The Court does not credit Maher's testimony that Johnson told him that the SEC complaint against Johnson was based on a disgruntled customer.  Maher appears to be confusing what was disclosed in the PPM about Johnson—that the SEC had filed a complaint against him for misrepresentations in a private placement memorandum, PX 7 at MAHER 000435—with a separate disclosure also in the PPM that Allen had been the subject of a disciplinary proceeding by FINRA for alleged violations of conduct rules of the National Association of Securities Dealers ("NASD") and FINRA, *id.* at MAHER 000411.  If Johnson said anything to Maher about a regulatory complaint being the product of a disgruntled investor, it would have been about the FINRA complaint.  It is implausible that Johnson, who disclosed the SEC complaint in the Global Factors PPM, would have told Maher that the complaint was simply that of a disgruntled investor.  Not only would such a response have been unlikely to have quelled any concerns about the complaint or about Johnson, but it would have been readily and conclusively

dispelled.  The PPM contained a link to the SEC complaint, *id.* at MAHER 000435, but not to the FINRA proceeding, *id.* at MAHER000411.  Maher, whose research skills appear not to have been lacking, could have readily clicked on the link and found the allegations of the SEC. Johnson disputed Maher's contention that he described the SEC complaint as resulting from the allegations of a disgruntled investor.  Trial Tr. at 371:20–23.  According to Johnson, he made clear to Maher that the SEC complaint was not the result of any investor complaint, and that there were not any investor complaints regarding AGF II.  Trial Tr. at 372:1–4.  Johnson explained that, instead, the SEC complaint arose out of "an inquiry from the broker-dealer investigation unit that escalated into a complaint."  Trial Tr. at 372:4–6.  Tellingly, while there are extensive emails between the parties, there are no contemporaneous emails that contain or refer to Johnson's alleged false statement.

Plaintiffs also have not proved that the statement in the Global Factors's PPM that Johnson believed the allegations of the SEC to be without factual merit and planned to vigorously defend himself against them were false.  Plaintiffs' claim is pure fraud by hindsight. *See Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.).  There is no evidence that, at the time the statement was made, Johnson had any intent or plan other than to defend himself vigorously against the allegations.  The date of the memorandum is May 16, 2016; it was provided to Maher in August 2018.  PX 7 at MAHER 000396, 000398.  The SEC settlement is dated January 2019.  PX 87.  It was consented to on a no-admit, no-deny basis, meaning that Johnson did not admit that the allegations of the SEC had factual merit.  *Id.*  There is no evidence whatsoever that the settlement was reached other than through a hotly contested proceeding, in which Johnson attempted to defend himself.  Johnson did not represent that the SEC would not be able to prove its allegations.  The very next sentences in the Global Factors PPM, after that

which Maher relies upon, states: "There can be no assurance that they [Johnson and the other defendants] will prevail. Investors are cautioned that a decision against any or all of the defendants in the complaint could materially adversely affect Mr. Johnson's reputation and ability to operate and, consequently, your investment in, the Company." PX 7 at MAHER 000435. The fact that Johnson later agreed to a settlement with the SEC, without admitting the violations, does not establish that the allegations of the SEC were accurate much less that Johnson agreed that they were accurate. *Cf. In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2022 WL 4087842, at *3 (S.D.N.Y. Sep. 6, 2022).

Even if the Court were to conclude that Plaintiffs had carried their burden to show that Johnson made material misrepresentations about the nature of the complaint and his intent to defend against the action, it would not have been reasonable for Plaintiffs to rely on those representations. With respect to the nature of the complaint, the PPM included not only the link to the complaint itself (which Maher concedes he did not read), but also a detailed, substantive description of the nature of the action and the potential negative consequences of an adverse decision. *See* PX 7 at MAHER 000435. For example, the private placement memorandum notes that "[t]he complaint alleges that versions of the private placement memorandum used by [an] Affiliate [of Global Factors] in its offering of securities stated that the Affiliate's financial statements would be audited and made available to investors within 90 days of the end of the calendar year being audited, when in fact audited financial statements were not completed until 2014." *Id.* It would not have been reasonable for Maher to rely upon a brief description of the substance of the action provided by Johnson in a single phone call when Maher had been provided with a detailed description of the action and with a link to the full complaint.

### D.      Wall Street Pizza

Finally, Plaintiffs allege that Defendants intentionally misstated Global Factors's business and the security underlying Global Factors's contracts.  Among other things, Plaintiffs allege Defendants misrepresented that the contracts:

> were fully collateralized, such collateral had been thoroughly reviewed to ensure that it was not encumbered, that the owners of the entities to which Global lent money had provided personal guarantees to Global, that Johnson's investments in Global would be used to offer small business financing alternatives (when, in reality there is no evidence such collateral or guarantees were obtained and, on at least two occasions, Maher's (and other Global shareholders') investment was used to pay an investor in one Johnson's many other companies), and that Global would collect fees and interest from these legitimate business entities.

Dkt. No. 40 at 13.  Put differently, Plaintiffs claim that Defendants made material misrepresentations with respect to the security of their contracts with customers in two respects. First, Plaintiffs allege that Defendants overstated the amount and nature of the collateral pledged against the agreements.  Second, Plaintiffs allege that Defendants misrepresented the nature of the agreements such that the collateral Defendants claimed to receive from counterparties was illusory.  Plaintiffs have satisfied their burden of establishing by clear and convincing evidence that Defendants made affirmative misrepresentations and actionable half-truths regarding Global Factors's business and the nature of the financing agreements that Global Factors typically entered into, and that Defendants are liable to Plaintiffs for those misrepresentations.

In his introductory email to Maher, Johnson described Global Factors as "a leading provider of cash flow solutions to merchants all across the country."  PX 7 at MAHER 000396. The PPM, among many other descriptions of Global Factors's business, states that Global Factors generally, "was formed to offer small businesses a variety of financing alternatives, including payroll advances directly and through third-party professional employer organizations, accounts receivable factoring, short-term line of credit loans, and other types of loan products

and cash flow financing in the discretion of the Manager."  *Id.* at MAHER 000406.  In

subsequent emails that Johnson sent Maher while trying to secure Maher's investment in Global

Factors, Johnson continued to describe Global Factors's business as providing alternative

financing arrangements to companies, including through purchases of accounts receivable.  For

example, on August 10, 2018, Johnson described Global Factors's business in the following

terms:

> Food for thought: We purchase receivables anywhere between 67 and 72% of face
> value on average per year and collect on most contracts on a daily basis (35% or
> higher gross IRR).  A small percentage are collected weekly and one or two are
> collected monthly.  On the other hand, our investors collect 12%, paid monthly at
> the highest frequency, and most reinvest.  Good for both of us.  They compound 12
> times per year, we compound more than that.  Powerful numbers.

PX 10 at MAHER 000521.  Maher also testified at trial that Johnson told him that "every loan

was fully collateralized," and that every loan came with "personal guarantees by principals or

owners of the company."  Trial Tr. at 42:12–13.  According to Maher, he asked Johnson whether

it was standard practice to also receive personal financial statements in order to ensure that the

personal guarantees were meaningful, and Johnson replied in the affirmative.  Trial Tr. at 42:18–

25.  Finally, he testified that Johnson told him that if customers were to default on their loans

from Global Factors, that Global Factors vigorously enforced the loans.  Trial Tr. at 43:1–8.

As the finder of fact, the Court concludes that those representations materially and

knowingly false.  They would have created the impression that Global Factors was a legitimate

business that used the funds that investors placed in it to make fully secured loans to functioning

business.  The undisclosed truth, however, was that Johnson was using Global Factors at least in

part as his personal piggy bank, deploying investor funds not to generate returns for them but to

satisfy Johnson's obligations with respect to another business.  In particular, the evidence

establishes that at the time of the representations, Johnson had caused Global Factors simply to

divert $295,000 of its investors' money to discharge an obligation of one of Johnson's other businesses and to camouflage that dissipation of Global Factors's assets through a series of agreements that purported to contain security guarantees but that Johnson (and his counterparty Langhamer) knew were shams.[10]

That sum was not an immaterial number.  It represented nearly one-half of what Global Factors represented to be the excess of assets over liabilities in its financial statements.  The positive statements that Johnson made about Global Factors's business clearly gave rise to a duty to disclose the misappropriation of funds he effected through Global Factors.  The failure to make that disclosure constitutes an actionable half-truth.  *See, e.g.*, *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250–51 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context."); *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[U]pon choosing to speak, one must speak truthfully about material issues.  Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete."); *see also Macquarie Infrastructure Corp.*, 601 U.S. at 263 ("Half-truths . . . are 'representations that state the truth only as far as it goes, while omitting critical qualifying information.'" (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*,

---

[10] Plaintiffs have produced evidence suggesting that other transactions entered into by Global Factors also may not have been collateralized with as much security as Johnson described to Maher while soliciting his investment.  Specifically, Plaintiffs point to an auditor's report dated October 2021, which includes raw data regarding the amount collected on all Global Factors transactions.  *See* PX 79.  The data shows that Global Factors had funded many transactions prior to Plaintiffs' investment that still had not produced even a single dollar in collections.  *Id.* at 4–5.

579 U.S. 176, 188 (2016))).

In addition, Defendants acted with the requisite scienter when they misled Plaintiffs with respect to the nature of Global Factors's business.  *See Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) ("Whether a given intent existed is generally a question of fact, appropriate for resolution be the trier of fact.").  Johnson had both motive and opportunity to make identified misrepresentations when he was connected with Maher through a mutual acquaintance so that Maher could consider whether to invest in Global Factors.  Johnson knew of the existence of the agreements with Wall Street Pizza, one of which was entered into on July 19, 2017 and the other of which was entered into on August 8, 2018, at the precise time he was seeking to solicit an investment in Global Factors from Maher—efforts that began on August 6, 2018, *see* PX 7, and culminated in investments by Maher on October 15, November 15, and December 17, 2018, *see* PX 1–3.  He arranged for those agreements himself.  He did so to satisfy an obligation that his other company owed.  The timing of the entry into the second known agreement with Wall Street Pizza—just two days after Johnson first contacted Maher about a potential investment in Global Factors—is particularly instructive of Johnson's knowledge and intent while soliciting an investment from Maher that Global Factors funds would be used to satisfy obligations to AGF II's investors.

Plaintiffs further have carried their burden of showing that they relied upon Defendants' representations with respect to the nature of the Global Factors business, and how their funds would be utilized if they were to invest in Global Factors.  The evidence presented at trial established that Maher conceived of his investment-evaluation analysis, and conducted that analysis, based upon the principle that Global Factors provided alternative financing mechanisms to small businesses enabling the disbursement of regular distributions and at the same time,

continuous deployment of capital.  *See, e.g.*, PX 16 ("Based on how you explained how things worked, I would have guessed the loan balances (including all owed interest) would have exceeded the member account by 10% or more . . . ."); PX 17 ("In addition to the syndication fees/income, I realized there's another item I need to get a good picture of the status of the fund, and that is the average duration (s/b dollar-weighted, I think) of the remaining term on the loan/syndication agreements."); PX 19 ("On the attached, I added 27% for the receivable income for the syndication.  I then put 12 months as the average duration remaining on the loans/assets for the funds.  If I add 12 months of income liability on the member accounts (to match the average duration of the loan asset payments/income), this gives us an adjusted 'cushion' as shown on the attached . . . ."); Trial Tr. at 17:17–20 ("I had a number of questions. . . . [W]hat [is] syndication participation?  What are merchant receivables?  I had some assumptions on that, you know. . . . What's accrued participation fee income?  What was that?  So we talked, you know.").  Maher asked detailed questions about the financial statements, which evince that Maher had developed an understanding of Global Factors based upon the PPM and his conversations with Johnson.  *See, e.g.*, Trial Tr. at 19:23–20–14 ("[T]he biggest thing I took from that, the conversation, was the deferred receivable premium income, the 1.6 million, he explained it's also shown in the assets.  And the reason it has to be shown in the liabilities, my recollection was the wording he used, the accountants really don't know what to do with that, so they don't let us recognize the income on the contracts, which is what that is.  They only let us recognize the principal on the contracts in the assets.").  Maher's review of the Company's financial statements was intricately informed by his understanding of how the business operated, and how investor funds would be used:

> So the merchant receivables and the syndication participation were the value of the contracts.   So   when   they   would   buy—either   do   a   payroll   advance   or   buy

receivables, they would give the company a certain amount of money.  That's the merchant receivables and syndication participation.  So let's say they are buying $130,000 of receivables for $100,000.  $100,000 is the merchant receivables and syndication participation.  The extra 30,000 was receivables premium.  So they had a contract for—the contract with the company included that receivable premium.  They just couldn't recognize it as an asset on the balance sheet without backing out that receivable premium.  They could only recognize the amount they gave to the company, the $100,000.

Trial Tr. at 20:18–21:6.  In fact, Global Factors was used, at least in part, as a vehicle not to purchase assets but to satisfy Johnson's obligations in connection with AGF II.  In sum, the Court finds that Plaintiffs relied upon Johnson's representations about the nature of the business, and the use of investor funds, in deciding whether to invest in Global Factors.

The Court also finds that such reliance was reasonable.  Maher, although not a novice to investments in private companies, *see* Trial Tr. at 5:15–18, was not a professional investor by trade, was investing only his and his family's own savings, and had limited investing experience that was mostly in the realm of publicly traded stocks and bonds, Trial Tr. at 5:1–16.  Further, Maher was initially connected with Johnson for the purpose of investing in Global Factors by a long-time friend of Maher's that had already invest in Global Factors, putting Maher in a position to more readily trust the credibility of the enterprise.  *See* Trial Tr. at 6:21–7:6.  Once contacted, Maher did not seek to rush or expedite the transaction, and instead sought from Johnson information that would help him complete the analysis he believed to be most central to evaluating the opportunity.  Maher sent Johnson numerous emails requesting further information, and spoke over the phone with Johnson on several occasions to discuss his follow-up questions.  Johnson had unique access to Global Factors's customer contracts, which were not available to Maher as he was considering making an investment in Global Factors.  Maher would have no opportunity or ability to detect the fraud given that the arrangement with Wall Street Pizza was specifically designed to avoid detection as an instrument of deception, as what in fact was the

payment of a redemption to an investor in AGF II with funds from Global Factors was veiled by the façade of a contract for the purchase of future accounts receivable. Thus, even if Maher had been able to see Global Factors's contracts with its customers, it would not have been apparent that something was amiss and that fraud was afoot.

At oral argument on the issues of loss causation and damages, Defendants asserted that Plaintiffs' reliance could not have been reasonable because of risk disclosure language in the PPM. The PPM identified as a risk that "Obligors may fail to repay the Advances." PX 7, at MAHER 000412. It also disclosed as a risk: "If the Company forecloses on collateral, if any, pledged with respect to any Advances, the outcome may be uncertain and the collateral may not be sufficient to repay the Advances." *Id.* at MAHER 000414.

That argument is unavailing. Under the "bespeaks caution" doctrine, "[c]ertain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002). "The cautionary language, however, must relate directly to that by which plaintiffs claim to have been misled." *Hunt v. Alliance N. Am. Gov. Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998); *see also Halperin*, 295 F.3d at 359 ("Cautionary language in securities offerings is just about universal. . . . Plaintiffs may [defeat a motion to dismiss] by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss."); *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."). Nor does the doctrine apply, "where a risk disclosed by Defendants has already transpired at the time the

statements at issue were made." *Winter v. Stronghold Digital Mining, Inc.*, 686 F. Supp. 3d 295, 309 (S.D.N.Y. 2023) (citing *Rombach*, 355 F.3d at 173).  The risk disclosures do not help Defendants here.  Neither disclosed that Global Factors had entered into advance agreements that were illusory.  *See Hunt*, 159 F.3d at 729 ("The cautionary language contained in the prospectus does not necessarily foreclose liability because it warned investors of a different contingency than that which plaintiffs allege was misrepresented.  The prospectuses warned that the Fund's hedging maneuvers might fail, not that the Fund would have no opportunity to use hedging maneuvers.").  The first risk disclosure focused on the risk that the obligor would become insolvent or file for bankruptcy.  PX 7 at MAHER 000412.  The second presumed the existed of collateral.  It stated in pertinent part: "***If the Company forecloses on collateral, if any, pledged with respect to any Advances, the outcome may be uncertain and the collateral may not be sufficient to repay the Advances.***  The Company may find it necessary or desirable to foreclose on collateral securing one or more of its Advances.  The foreclosure process can be lengthy and expensive, and the outcome can be uncertain . . . ."  *Id.* at MAHER 000414 (emphasis in original).  They were not sufficient to put Maher, or any reasonable investor, on notice that the investment they made for the purpose of purchasing receivables of small businesses, in fact was being used to satisfy the obligation of AGF II.

Plaintiffs have carried their burden of demonstrating loss causation—a causal link between the subject of the misrepresentations made by Johnson and the loss that they suffered.  *See, e.g.*, *Emergent Cap. Inv. Mgmt., LLC*, 343 F.3d at 197; *see also In re Vivendi*, 838 F.3d at 261 ("If 'the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant . . . is sufficiently direct, loss causation is established.'" (alteration in original) (quoting *Lentell*, 396 F.3d at 174)); *Lentell*, 396 F.3d at 173; *Castellano v. Young &*

*Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001) ("While transaction causation is generally understood as reliance, loss causation has often been described as proximate cause, meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission."); *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1495 (2d Cir. 1992) ("[I]n order to establish loss causation, a plaintiff must prove that the damage suffered was a foreseeable consequence of the misrepresentation."). "[I]f the loss was caused by an intervening event, . . . the chain of causation will not have been established." *Emergent Cap. Inv. Mgmt., LLC*, 343 F.3d at 197; *see In re Merrill Lynch & Co. Rsch. Reports Sec. Litig.*, 568 F. Supp. 2d 349, 360 (S.D.N.Y. 2008).

The immediate cause of Plaintiffs' loss were the decisions by Global Factors first in March 2020 to suspend all investor distributions for a period of ninety days, PX 44 at MAHER 000982, which was extended in subsequent months, PX 46 at MAHER 000995–96; PX 47 at MAHER 001009; PX 49 at MAHER 001027, and then in November 2020 to liquidate and dissolve Global Factors, PX 55 at MAHER 001165. As a result, Global Factors failed to comply with any of Maher's redemption requests. On September 16, 2020, Maher submitted his first formal request to redeem in full all funds owed to him associated with his $523,000 investment dated October 15, 2018. *See* PX 48. On October 15, 2020, Maher submitted a formal request to redeem in full all funds owed to the Trust associated with the $430,000 investment made by the Trust on November 15, 2018. *See* PX 52. Finally, on November 17, 2020, Maher submitted a request to redeem in full all funds owed to him associated with the $49,000 investment made on December 17, 2018. *See* PX 54. None of the requests was fully satisfied. Despite submitting redemption requests for the full investment of $1,002,000, as well as all accrued distributions,

Plaintiffs received only $106,432 in liquidation payments from Global Factors.  Stipulated Facts ¶¶ 18, 19.

Defendants ascribed the decisions to the onset of the COVID-19 pandemic.  *See, e.g.*, PX 44 at MAHER 000983 ("With businesses and merchants being forced to shut down, we will likely curtail all new funding of any new transactions until further notice. . . .  Obviously, collecting on existing receivables is also on hold, for all the same reasons.  Therefore, it also will place on hold any investor distributions, accrued or electronically paid, for a period of ninety days."); PX 45 at MAHER 000995 ("With the current government lock-down still in effect, only a small percentage of our small business customers are open and conducting any meaningful business. . . .  While we originally hoped for a ninety-day period of limited inactivity and thusly a moratorium on all interest paid to capital accounts, it appears we may be in for slightly longer than that given the directives provided by our federal and local governments."); PX 53 at MAHER 001085 ("Collection activity is still well below pre-pandemic levels, and there have been increasing cases around the country in many jurisdictions, so we are carefully monitoring the situation and will keep you posted on any new developments.  We still are not able to predict when redemption processing and monthly payments to investors will resume, but we are monitoring it every week based on the actual amount of business we are able to conduct."); PX 55 at MAHER 00164 ("We are still collecting roughly only 15–20% of those originally scheduled payments.  The immediate outlook is not much better, with record number of infections, hospitalizations, and deaths surging throughout the country many cities and states have already instituted another lockdown, and others seem primed to follow suit.").  According to Defendants, it was therefore COVID-19, and not any alleged fraud, that caused Plaintiffs' loss.

The Court concludes, however, that the COVID-19 pandemic was not an intervening event breaking the chain of causation.  *See DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 125 (S.D.N.Y. 2004) ("[A]s the Second Circuit was careful to point out in *Gelt Funding*, neither did the Court 'mean to suggest that in all cases a fraud plaintiff will be unable to plead proximate causation when the claim follows a market collapse.'" (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994))).  It was a contributing factor which revealed the risk that had been concealed by Defendants' misrepresentations.  *See id.* at 123 ("[P]laintiffs' theory of the case is that these defendants deliberately participated in inflating the bubble in the first place by disseminating the very misrepresentations at issue.  Thus, the publication of the intentionally false opinions that allegedly distorted the market price of Corvis stock contained the seeds of loss causation.  Unless an intervening event were to occur first, the author of the false opinion will be appropriately held responsible when the market eventually corrects the artificially inflated price by bursting the bubble.").  Defendants' fraud depended on the stream of new investments into Global Factors and the purchase of new receivables being sufficient to hide the funds that Defendants misappropriated from Global Factors, including to satisfy Johnson's obligations to Langhamer.  As long as Global Factors was able to raise new capital and to deploy that capital to purchase actual collectible receivables, the inability to collect any money from Langhamer and Wall Street Pizza could remain concealed.  However, if there was an exogenous event that caused Global Factors's business to slow down, then the funds that were misappropriated from Global Factors would become critical.  They would be necessary to satisfy redemption requests and the known inability to collect on the sham agreement with Wall Street Pizza would contribute to the collapse of Global Factors.

The evidence establishes that that is precisely what happened in 2020.  Global Factors was no longer able to attract new investors and to purchase new receivables.  *See* PX 44 at MAHER 000983 ("There is too much risk in purchasing receivables of businesses that are still open for now, and in most cases, there aren't any to purchase at all now because many are physically closed or near closing."); PX 55 at MAHER 00164 ("Since May, we have only been funding essential businesses, and those merchants that are less affected by Covid-19 restrictions."); *see also id.* at MAHER 00165 (explaining that Global Factors was implementing an exchange offer because "by taking decisive actions," Global Factors could "[r]aise capital from outside sources").  And, with the inability to attract new funds, it became critical for Global Factors to collect on its old purchase of receivables.  *See* PX 46 at MAHER 000996 ("We are in steady communication with our customers and the feedback has been positive.  They understand our position is one of patience, but we fully expect they will fulfill their obligations when business resumes to the new 'normal.'").  But, as the investor letters transparently demonstrate, Global Factors was not able to collect on the receivables.  *See, e.g.*, PX 53 at MAHER 001085; PX 55 at MAHER 00164–65 ("This second wave of the virus will undoubtedly slow recovery, and it would be foolhardy not to believe that many of our small business clients will find it exceedingly difficult to recover from this unprecedented disaster.").  In fact, Global Factors's November 22, 2020 letter ascribed the decision to liquidate explicitly to the inability to collect; the letter states that the decision to liquidate was reached because Global Factors was "still collecting roughly only 15–20% of [the] originally scheduled payments" from customers.  PX 55 at MAHER 001164.  But contrary to Defendants' representations, it was not the pandemic that prevented Global Factors from collecting.  Global Factors was not able to collect, in part, because some of the purported purchases of receivables were shams.  The assets did not exist and

there was no real promise to repay Global Factors anything.  Johnson simply gave away money

belonging to Maher and others in order to satisfy an obligation of another of his companies.

Accordingly, the evidence establishes that a portion of Plaintiffs' loss was the result of the

materialization of the very risk that Defendants had concealed.  Had the represented facts been

the accurate facts, Global Factors would not have suffered the loss that it did.  *See Castellano*,

257 F.3d at 189 (holding a jury could find loss causation because defendants failed to disclose to

plaintiff "the very risk to which [plaintiff] fell victim"); *In re Vivendi*, 838 F.3d at 261 ("[P]roof

of loss causation requires demonstrating that 'the *subject* of the fraudulent statement or omission

was the cause of the actual loss suffered.'" (emphasis added) (quoting *Suez Equity*, 250 F.3d at

95)); *Emergent Cap. Inv. Mgmt.,* LLC, 343 F.3d at 197–98 (finding loss causation sufficiently

alleged because defendants concealed risk that they would "dump" their own shares by failing to

reveal their previous "pump and dump" schemes); *see also In re Vivendi*, 838 F.3d at 262

("Here, although no specific corrective disclosure ever exposed the precise extent of Vivendi's

alleged fraud, Plaintiffs' theory of loss causation nevertheless rested on the revelation of the

truth.  According to Plaintiffs, Vivendi's alleged misstatements concealed its liquidity risk, and a

series of events in the first half of 2002 made the truth about that liquidity risk come to light.");

*DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 213

(S.D.N.Y. 2019) ("Pleading a materialization of the risk requires identifying a particular risk that

was allegedly concealed by the defendant's actions and which then materialized to cause a

market loss.").  Plaintiffs have therefore carried their burden of establishing Plaintiffs' liability

under the Exchange Act.

     **E.**       **Section 20(a)**

     Section 20(a) of the Exchange Act states, in pertinent part:

> Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  In order to prove a claim under Section 20, "a plaintiff must show (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998) (quoting *First Jersey*, 101 F.3d at 1472).  "It is axiomatic that liability for a Section 20(a) violation is derivative of liability for a Section 10(b) violation." *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 437 (S.D.N.Y. 2014).  "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"  *First Jersey*, 101 F.3d at 1472–73 (quoting 17 C.F.R. § 240.12b–2).  "'Controlling-person liability' under § 20 of the Securities Exchange Act is a separate inquiry from that of primary liability and provides an alternative basis of culpability." *Suez Equity Invs. v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001). "[A] defendant ultimately may not be held liable as both a primary violator and a controlling person." *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 310 (S.D.N.Y. 2005) (citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001)).

Here, for the most part, Johnson is directly implicated in the conduct of Global Factors that gives rise to Plaintiffs' claims under the Securities Exchange Act.  Johnson made almost all of the communications with Maher that induced Maher to invest in Global Factors.  For those, he is responsible as a "maker" of the statements at issue. *Janus Cap. Grp., Inc. v. First Derivative*

*Traders*, 564 U.S. 135, 142–44 (2011).  To the extent Johnson is not directly liable, however, he is liable as a control person.  Johnson had a controlling ownership stake in Global Factors, Trial Tr. at 188:11–14, and was also the Chairman of the Board of Managers of Global Factors, Trial Tr. at 188:15–17; *see also* PPM at 25.  The PPM itself stated that Johnson oversaw the day-to-day operations of Global Factors, PPM at 25, which Johnson described at trial as "managing the sales offices, managing review of the funding applications from new and existing clients and everything in between," Trial Tr. at 191:6–9.  Many of the relevant communications that were not made by him were made at his direction.  Thus, he had control and was a culpable participant in the fraud perpetrated on Maher.  *See First Jersey*, 101 F.3d at 1473; *In re Emex Corp. Sec. Litig.*, 2002 WL 31093612, at *9 (S.D.N.Y. Sept. 18, 2002) (finding control where individual defendants held management or board positions and drafted and disseminated the misleading press releases at issue); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005);

## II.    Common Law Fraud

"Under New York law, to state a claim for fraud, a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."  *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001); *Pasternack v. Lab'y Corp. of Am. Holdings*, 59 N.E.3d 485, 491 (N.Y. 2016) ("The elements of a fraud cause of action consist of a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." (internal citations and quotation marks omitted)).  The elements of a claim under Section 10(b) of the Securities Exchange Act are "are essentially the same as those for common law fraud in New York."  *Meridian Horizon Fund, LP*

*v. Tremont Grp. Holdings, Inc.*, 747 F.Supp.2d 406, 414 (S.D.N.Y.2010), *aff'd sub nom.*

*Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636 (2d Cir.2012) (summary

order); *Newman v. Family Mgmt. Corp.*, 530 F. App'x 21, 24 (2d Cir. 2013) (summary order)

("The elements of claims for federal securities fraud and New York common law fraud are

nearly identical."); *see also Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 298

(S.D.N.Y. 2011) ("Because the elements of common law fraud under New York law are

substantially identical to those governing 10(b), an identical analysis applies." (citation and

internal quotation marks omitted)); *Morse v. Weingarten*, 777 F. Supp. 312, 319 (S.D.N.Y.

1991). Even so, "[o]ne major difference between a claim under § 10(b) and New York common

law is that, as discussed supra, plaintiffs must prove each element of common law fraud by clear

and convincing evidence, as opposed to a preponderance of the evidence." *Marini*, 995 F. Supp.

2d at 198.

Plaintiff alleges that Johnson, personally and as control person of Global Factors,

fraudulently induced him into purchasing units of the company by (1) misrepresenting the

profitability of Global Factors's business; making materially false and misleading statements

regarding the financial condition of Global Factors; (2) omitting to state material information

regarding the SEC complaint against Johnson; and (3) making materially false and misleading

statements regarding the nature of the contracts issued by Global Factors and the security for

those contracts. Dkt. No. 39 at 5.

Because Plaintiffs rely on the same alleged misrepresentations in their fraud claim as they

did in their Exchange Act claims, and because the burden of proof for Plaintiff's fraud claim is

higher than the burden of proof for the Exchange Act claims, the misrepresentations that could

not support liability under the Exchange Act cannot support a finding of liability for fraud. For

the reasons stated earlier, however, Plaintiffs have proven by clear and convincing evidence that Defendants are liable for their material misstatements and omissions regarding Wall Street Pizza.

## III.    Negligent Misrepresentation

"Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000). "The standard for loss causation that applies to fraud claims also applies to negligent misrepresentation claims." *Fin. Guar. Ins. Co.*, 2020 WL 5518146, at *104 (citing *Laub v. Faessel*, 745 N.Y.S.2d 534, 537 (1st Dep't 2002)).

A party who shares, without sufficient care, "a thought" or delivers a statement with "the explosive power resident in words" is not thereby rendered liable "in an indeterminate amount for an indeterminate time to an indeterminate class" of all persons who are exposed to the thought or statement and rely upon it. *Ultramares Corp. v. Touche*, 174 N.E. 441, 444–45 (N.Y. 1931) (Cardozo, C.J.). "[M]isstatements are actionable only if the defendant is 'under a duty to the plaintiff to exercise reasonable care in giving the information, and plaintiffs' reliance upon the information [is] foreseeable.'" *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (quoting *Heard v. City of New York*, 623 N.E.2d 541, 545 (N.Y. 1993)). Whether such a duty exists depends upon "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose."

*Budhani v. Monster Energy Co.*, 527 F. Supp. 3d 667, 684 (S.D.N.Y. 2021) (quoting *Suez Equity Invs. L.P.*, 250 F.3d at 103); *see Kimmell v. Schaefer*, 675 N.E.2d 450, 454 (N.Y. 1996).  A special relationship to provide correct information, meanwhile, exists when "(1) the defendant had awareness that its work was to be used for a particular purpose; (2) there was reliance by a third party known to the defendant in furtherance of that purpose; and (3) there existed some conduct by the defendant linking it to that known third party evincing the defendant's understanding of the third party's reliance."  *Bayerische Landesbank v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 59 (2d Cir. 2012) (citing *Credit All. Corp. v. Arthur Andersen & Co.*, 483 N.E.2d 110, 118 (N.Y. 1985)).  "The[se] indicia, while distinct, are interrelated and collectively require a third party claiming harm to demonstrate a relationship or bond with the once-removed [defendant] 'sufficiently approaching privity' based on 'some conduct on the part of the [defendant.].'"  *Sec. Pac. Bus. Credit v. Peat Marwick Main & Co.*, 597 N.E.2d 1080, 1083–84 (N.Y. 1992) (citation omitted).

For the reasons already stated, including that Plaintiffs failed to demonstrate a material misstatement regarding the Company's revenue profile, that Plaintiffs failed to demonstrate reliance on Defendants' representations regarding the Company's ability to meet its obligations to its investors, and that Plaintiffs failed to demonstrate a material misstatement regarding the SEC Complaint, the Court finds that Defendants are not liable to Plaintiffs for negligent misrepresentation based upon those alleged misrepresentations.  The claims under the Securities Exchange Act and for fraud based upon those alleged misrepresentations each failed because Plaintiffs failed to carry their burden of proof for elements that are also applicable to a claim for negligent misrepresentation.

Additionally, the Court has already determined that Defendants are liable to Plaintiffs under the Securities Exchange Act and for fraud for the very same misrepresentations that underlie their remaining claim for negligent misrepresentation.  But, "a claim for negligent misrepresentation requires proof that defendant spoke with carelessness," and "[a] party's conduct cannot simultaneously be intentional and careless."  *Hettinger v. Kleinman*, 733 F. Supp. 2d 421, 447–48 (S.D.N.Y. 2010) (citing *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003)); *White v. Guarente*, 43 N.Y.2d 356, 363 (1977); *Hydro Invs., Inc.*, 227 F.3d at 20.  In other words, "the same factual predicate cannot support both a finding of liability based on reckless or intentional conduct and a finding of liability based on negligent conduct . . . ."  *Brown v. City of New York*, 2005 WL 758781, at *4 (E.D.N.Y. Mar. 30, 2005); *see also Dorn v. Maffei*, 386 F. Supp. 2d 479, 486 n.5 (S.D.N.Y. 2005) ("[N]egligence claims cannot coexist with claims for intentional torts such as intentional inflicting of emotional distress." (citing *United Nat'l Ins. Co. v. Tunnel, Inc.*, 988 F.2d 351, 353 (2d Cir. 1993))).  The Court therefore concludes that Defendants are not liable to Plaintiffs for negligent misrepresentation.

Plaintiffs' claim for negligent misrepresentation also fail for an independent reason— Plaintiffs have not carried their burden of showing that Defendants owed them a duty that could give rise to a claim for negligent misrepresentation.  The evidence establishes that the transactions solicited, and ultimately executed, were "nothing more than an arm's length business arrangement between sophisticated and experienced parties, a circumstance insufficient to create a 'special relationship.'"  *Amusement Indu., Inc. v. Stern*, 786 F. Supp. 2d 758, 779 (S.D.N.Y. 2011) (citing *Aerolineas Galapagos, S.A. v. Sundowner Alexandria, LLC*, 905 N.Y.S.2d 152 (1st Dep't 2010)); *see also Silvers v. State*, 893 N.Y.S.2d 12 (1st Dep't 2009) ("[T]he arm's-length business relationship . . . is not generally considered to be of the sort of a

confidential or fiduciary nature that would support a cause of action for negligent

misrepresentation" (citation omitted)); *MBIA Ins. Corp. v. Royal Bank of Can.*, 28 Misc.3d

1225(A), 2010 WL 3294302, at *34 (N.Y. Sup. Ct. Aug. 19, 2010) ("The special relationship is

limited to situations involving a 'fiduciary relationship or a position of trust or confidence . . .

[and][c]ommercial parties acting at arms' length in negotiating a contract are not in a special

relationship." (citations omitted) (alterations and omission in original)).  The parties here "had no

relationship prior to this arms-length transaction."  *M & T Bank Corp. v. Gemstone CDO VII,*

*Ltd.*, 891 N.Y.S.2d 578, 581 (4th Dep't 2009).  Defendants are therefore not liable to Plaintiffs

for negligent misrepresentation.

## IV.    Damages

Having found that Defendants are liable to Plaintiffs under the Securities Exchange Act

and for common law fraud, the Court now considers the issue of the relief to which Plaintiffs are

entitled.  Plaintiffs seek damages in the amount of $1,352,631.86, representing the amount that

Plaintiffs invested, offset by distributions and liquidation payments received by Defendants,

along with pre-judgment interest at a rate of nine percent per annum through February 5, 2024,

the beginning of the bench trial.  *See* Dkt. No. 39 at 13.

There is no dispute between the parties regarding the relevant measure of damages.[11]  *See*

Dkt. No. 55 (additional briefing on damages contesting only an award of prejudgment interest).

Although the Supreme Court has noted that "[t]he issue whether and under what circumstances

rescission or a rescissory measure of damages is available under § 10(b) is an unsettled one,"

*Randall v. Loftsgaarden*, 478 U.S. 647, 661 (1986), "[t]wo theories of damages for defrauded

buyers have been used in this circuit: out-of-pocket losses and the difference between purchase

---

[11] Although Defendants dispute liability, they do not dispute that a rescissory measure of
damages is permissible on the facts of this case.

price and subsequent resale price," *Clark v. John Lamula Invs., Inc.*, 583 F.2d 594, 603 (2d Cir. 1978); *see also In re UBS Auction Rate Secs. Litig.*, 2009 WL 860812, at *5 (S.D.N.Y. Mar. 30, 2009) (recognizing rescissory remedy for Rule 10b–5 violation); *JSMS Rural LP v. GMG Cap. Partners III, LP*, 2006 WL 1867482, *4 (S.D.N.Y. July 6, 2006) ("Courts have cautiously endorsed rescission as a possible remedy for some Rule 10b–5 violations."); *Panos v. Island Gem Enters., Ltd. N.V.*, 880 F. Supp. 169, 181–82 (S.D.N.Y. 1995) ("Defendants have offered two alternatives—out-of-pocket and rescissionary damages—either of which they assert are preferable to a benefit-of-the-bargain recovery.  We agree that given sufficient certainty and evidence of proximate causation, plaintiffs could recover pursuant to either of these measures of damage.").  The conception of damages advanced by Plaintiffs in the instant action falls within the latter category, often referred to as a rescissory measure of damages, pursuant to which a plaintiff is entitled to recover the difference between "his purchase price and subsequent sale price."  *Kronfeld v. Advest, Inc.*, 675 F. Supp. 1449, 1455 (S.D.N.Y. 1987); *see also Chasins v. Smith, Barney & Co.*, 438 F.2d 1167 (2d Cir. 1970); *cf. Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972) (calculating "out-of-pocket" damages as the difference between the amount that Plaintiff paid for the acquired securities and their true value at the time of sale).  Here, Plaintiffs did not in the conventional manner sell the securities, for which there was not a liquid market, but rather, sought to exercise their contractual option to redeem their units for payment from Global Factors.  Plaintiffs therefore seek to recover the difference between the purchase price that they paid for the Global Factors units, and the price at which it effectively sold those units back to Global Factors.

An award of rescissory damages is "justified where, as here, the evil is not the price at which [Plaintiffs] bought but the fact of being induced to buy and invest for some future growth

. . . without disclosure" of the material misrepresentation.  *Chasins*, 438 F.2d at 1173 (rejecting argument that "only the difference between the price charged him on his purchases and the fair market value on the purchase dates could be granted"); *Clark*, 583 F.2d at 604 (affirming award of rescissory damages as appropriate where "damages were awarded because appellants fraudulently induced appellee to buy unsuitable securities"); *Panos*, 880 F. Supp. at 181 ("[P]laintiffs may still seek less speculative remuneration under § 10(b) that is sufficiently tied to defendants' pre-purchase fraudulent misrepresentations . . . .").  Such damages are to be awarded only in "extraordinary" circumstances, "where the breach is found to be 'material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract.'"  *Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir. 1980) (quoting *Callanan v. Powers*, 92 N.E. 747, 752 (N.Y. 1910)).  They are awarded when the failure goes "to the root of the contract."  *Direction Assocs., Inc. v. Programming & Sys., Inc.*, 412 F. Supp. 714, 719 (S.D.N.Y. 1976); *see also Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 143 (2d Cir. 2000); *McDarren v. Marvel Ent. Grp., Inc.*, 1994 WL 388994, at *7 (S.D.N.Y. July 22, 1994).

Plaintiffs have proven their entitlement to rescissory damages to recover the cost of their investment.  *See, e.g., Blackie v. Barrack,* 524 F.2d 891, 909 (9th Cir. 1975) ("While out of pocket loss is the ordinary standard in a 10b–5 suit, it is within the discretion of the district judge in appropriate circumstances to apply a rescissory measure."), *cert. denied*, 429 U.S. 816 (1976).  The misrepresentations of Johnson and Global Factors were made to induce Plaintiffs to purchase Global Factors units.  They were not of the type that merely induced Plaintiffs to purchase units at an inflated price.  They also were material and went to the root of the contract.  Defendants represented that Plaintiffs were investing in an entity that would use their funds to purchase receivables from businesses that would generate those receivables and that would

provide security against any failure to do so.  Instead, they received interests in an entity that diverted at least a significant portion of those funds for Johnson's personal interests with no expectation or understanding that the funds would generate any receivables or any other thing of value for Global Factors's unitholders.  They were willful.  At the very same time, Johnson was diverting the funds to satisfy the obligations of his other related entity, he was also soliciting the funds from Maher under false pretenses.

The Court recognizes that an order of rescissory damages creates the risk that Plaintiffs will receive more in damages than the difference in value between what they paid for the securities at issue and what they were worth at the time of receipt.  It is likely that the securities had some value at the time Plaintiffs invested and that not all of the loss suffered by Plaintiffs from their investment was as a result of the representations regarding Global Factors's business and security not being true.  However, this is not a case in which the plaintiff seeks to hold liable a third party, such as a company making a misstatement for the excess in price the plaintiff had to pay to purchase securities in the open market.  Nor is this a case in which the value of the securities purchased by Plaintiffs is readily determinable.  Plaintiffs purchased directly from Defendants and thus Defendants themselves were enriched directly by the fraud.  There was no secondary market for the securities and thus their value, absent the fraud, cannot be measured by Plaintiffs.  As Plaintiffs emphasized, two separate independent valuation reports were solicited by Defendants—one by Star CPA, PLLC, *see* Dkt. No. 78, and one by Seymour J. Weinberg, *see* Dkt. No. 79—but each relied upon, and performed reviews of, data and internal models provided by Defendants themselves, Trial Tr. at 262:2–6, 280:18–24.  The two independent audit reports thus do not fill the gap in available data regarding the true value of the securities.

Defendants had the opportunity to contest the rescissory measure of damages and to argue that there should have been an offset based upon a general decline in the market for private securities.[12]  They did not do so.  In these circumstances, "[i]t is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them. . . .  [I]t is simple equity that a wrongdoer should disgorge his fraudulent enrichment."  *Janigan v. Taylor,* 344 F.2d 781, 786 (1st Cir.), *cert. denied,* 382 U.S. 879 (1965) ((citing *Falk v. Hoffman*, 233 N.Y. 199 (1922) (Cardozo, J.))).  Plaintiffs are therefore entitled to be made whole, as measured by the difference between the amount Plaintiffs invested and the amount realized when Plaintiffs sold the securities back to Defendants, reduced by the cash income received as distributions while Plaintiffs owned the units.  *See Randall*, 478 U.S. at 656, 662.[13]

Plaintiffs are not entitled to pre-judgment interest.  The decision to award prejudgment interest "should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed

---

[12] At trial, Plaintiffs' proposed calculation of damages was subject to cross-examination by Defendants.  That questioning, however, was focused largely on Plaintiffs' request for pre-judgment interest, and whether that request constituted a double-counting of reinvested distributions that Plaintiffs also requested as damages.  *See* Trial Tr. at 121:3–122:23.  A second round of questioning centered on whether Plaintiffs adjusted their damages calculation to reflect any tax benefit associated with the lost investment in Global Factors.  *See* Trial Tr. at 173:10–174:2.  But Defendants have made no showing that Plaintiffs here waited to bring their claims until they had "received the bulk of the tax benefits available," and that the Court should therefore find Plaintiffs barred from electing a rescissory measure of damages.  *Randall*, 478 U.S. at 666–67.

[13] Plaintiffs are not, however, awarded damages for the distributions for which they were entitled, but that were reinvested into additional units of Global Factors.  The purpose of a rescissory remedy is to restore a plaintiff to their position prior to the fraudulently induced transaction.  *See Clark*, 583 F.3d at 594 (stating that plaintiff's "total rescission damages are the difference between the price she paid and the price she received" because plaintiff was entitled to be made "whole").  Plaintiffs therefore cannot recover based upon profits earned by virtue of the investment.

relevant by the court." *Wickham Contracting Co. v. Local Union No. 3, IBEW*, 955 F.2d 831, 833–34 (2d Cir.), *cert. denied*, 506 U.S. 946 (1992).  "In deciding whether an award of prejudgment interest is warranted, it must be remembered that this is an equitable remedy and courts must be careful that an award does not overcompensate a plaintiff."  *Com. Union Assur. Co., plc v. Milken*, 17 F.3d 608, 614 (2d Cir. 1994).  Here, an award of prejudgment interest would serve to overcompensate Plaintiffs.  In exchange for his investment, Plaintiffs were entitled to be paid distributions in an amount equal to a percentage of their capital contributions.  PX 7 at MAHER 000445.  However, if Global Factors did not have available cash with which to make such distributions, in the form of cash in excess of the amount determined to be a reasonable reserve for the payment of liabilities, the amounts owed would simply accrue without interest until Global Factors was able to pay.  *Id.* at MAHER 000449, MAHER 000463.  If Global Factors never had any cash above that determined to be a reasonable reserve to pay liabilities, the investor would not receive any distributions.

Thus, in seeking not only the return of their investment, but also prejudgment interest on the amount of that investment, Plaintiffs are seeking a recovery far in excess of the actual damages they have suffered.  Plaintiffs' investment was risky.  Global Factors was a newly formed private company—there was no assurance that it would be able to purchase receivables in the future, much less that, going forward, it would have returns sufficient to permit the payment of distributions.  The investors certainly had no unconditional entitlement to distributions, or to interest on their investment.  *See Milken*, 17 F.3d at 614 ("Clearly the investment in the Boesky partnership was extremely risky, one where the investors might well have lost their capital, even absent any wrongful conduct by defendants.  Appellants were fully aware of the risk and chose to invest in spite of it.").  It follows then that an award of

prejudgment interest would give Plaintiffs far more than would be necessary to make them whole.  It would award them monetary relief in the form of cash which they had no assurance they would have received even if Global Factors had been what was represented and which they had no legal right to receive.

The Court therefore finds an award of Plaintiffs' investment in Global Factors, less payments made to them pursuant to those investments, appropriate here.  According to the Stipulated Facts, Plaintiffs invested a total of $1,002,000.00 in Global Factors, Stipulated Facts ¶¶ 8, 10, 11, received $66,650.00 in cash distributions while invested in Global Factors, *id.* ¶ 12, and received $106,432.17 in liquidation payments from Global Factors, *id.* ¶¶ 18, 19. Accordingly, the amount invested by Plaintiffs less the payments made to them pursuant to those investments is $828,917.83.

## CONCLUSION

For the reasons stated above, the Court awards Plaintiff a judgment of damages in the amount of $828,917.83.  The Clerk of Court is respectfully directed to enter Judgment in the amount of $828,917.83 in favor of Plaintiffs against Defendants jointly and severally, and to close this case.

SO ORDERED.

Dated: July 8, 2024
      New York, New York

                                        LEWIS J. LIMAN
                              United States District Judge